Paul Werner
Jonathan Stoler (*pro hac vice*)
Eric Raphan (*pro hac vice*)
Lindsay C. Stone (*pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., Suite 100
Washington, D.C. 20006
Tel.:  (202) 747-1900
Fax:  (202) 747-1901
pwerner@sheppardmullin.com
jstoler@sheppardmullin.com
eraphan@sheppardmullin.com
lstone@sheppardmullin.com
*Attorneys for Zeta Global Corp.*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
----------------------------------------------------- x
                                                      :
MELISSA RACKLIN,                                      :
                                                      :
                            Plaintiff,                :
                                                      :   Case No. 1:21-cv-01035-AJT-JFA
              v.                                      :
                                                      :
ZETA GLOBAL CORP.                                     :
                                                      :
                            Defendant.                :
                                                      :
                                                      :
                                                      :
                                                      :
----------------------------------------------------- x
```

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

STATEMENT OF UNDISPUTED FACTS ...........................................................1

I.      THE PARTIES .....................................................................................1

II.     DONALD STEELE AND CHAD MILLER .......................................................1

III.    MR. STEELE RECRUITS PLAINTIFF .........................................................2

IV.     PLAINTIFF ACCEPTS ZETA'S OFFER OF EMPLOYMENT ..............................3

V.      PLAINTIFF'S 2019 COMMISSION PLAN ....................................................4

VI.     PLAINTIFF PROSPECTS VERIZON FIOS ....................................................5

VII.    ZETA AMENDS THE 2019 PLAN TO RECOGNIZE PLAINTIFF'S EFFORTS...........6

VIII.   ZETA REORGANIZES ITS SALES FORCE IN MARCH 2020 .............................7

IX.     PLAINTIFF NEGOTIATES HER 2020 COMMISSION PLAN................................8

X.      MR. MARTELLA BUILDS ZX SALES AND DEVELOPS CONCERNS WITH
        PLAINTIFF'S PERFORMANCE IN 2020 .......................................................9

XI.     PLAINTIFF COMPLAINS TO ZETA'S HR IN DECEMBER 2020..........................10

XII.    PLAINTIFF'S 2021 COMMISSION PLAN ....................................................10

XIII.   THE ZX SALES TEAM CONTINUES TO DEVELOP IN 2021 .............................11

XIV.    PLAINTIFF'S POOR PERFORMANCE CONTINUES IN 2021 ..............................12

XV.     PLAINTIFF COMMENCES INDEFINITE PTO ...............................................12

ARGUMENT ................................................................................................14

I.      PLAINTIFF'S FII CLAIM IS TIME-BARRED AND OTHERWISE
        MERITLESS........................................................................................14

II.     PLAINTIFF'S BREACH OF CONTRACT AND VWPA CLAIMS ARE
        MERITLESS........................................................................................17

        A.      Zeta Paid Plaintiff's Verizon Commissions In Accordance With Her
                Commission Plans........................................................................17

        B.      Zeta Paid Plaintiff All Salary And Commissions She Was Owed.................19

III.    PLAINTIFF'S GENDER DISCRIMINATION CLAIMS MUST BE DISMISSED.........21

        A.      Plaintiff's Discrimination Claims Based Upon Mr. Miller's Compensation
                Are Meritless.............................................................................21

        B.      Plaintiff's Claims Regarding Verizon Are Untimely And False .................23

        C.      Zeta Did Not Subject Plaintiff To A Hostile Work Environment .................25

IV.     PLAINTIFF'S RETALIATION CLAIMS MUST BE DISMISSED...............................27

CONCLUSION ...............................................................................................30

TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Acosta v. Hilton Grand Vacations Co. LLC*
    No. 4:15-cv-00495, 2017 WL 1173583 (D.S.C. Mar. 30, 2017)............................................26

*Addison v. CMH Homes*
    47 F. Supp. 3d 404 (D.S.C. 2014)............................................................27

*Babus v. M/A-COM Private Radio Sys., Inc.*
    No. 6:06cv00048, 2007 WL 2288021 (W.D. Va. Aug. 7, 2007)...............................22, 23, 25

*Baqir v. Principi*
    434 F.3d 733 (4th Cir. 2006) ...............................................................28

*Bart-Williams v. Exxon Mobil Corp.*
    No. 1:16-cv-1338, 2017 WL 4401463 (E.D. Va. Sept. 28, 2017) ..............................21, 23, 25

*Boatright v. U.S. Bancorp*
    No. 18-cv-7293, 2020 WL 7388661 (S.D.N.Y. Dec. 16, 2020)............................................29

*Bolling v. Va. Dep't of Health*
    No. 3:12cv593, 2013 WL 12101106 (E.D. Va. Sept. 3, 2013)..........................................21, 22

*Buchhagen v. ICF Int'l, Inc.*
    545 F. App'x 217 (4th Cir. 2013) ............................................................27

*Buchhagen v. ICF Int'l, Inc.*
    650 F. App'x 824 (4th Cir. 2016) ............................................................28

*Causey v. Balog*
    162 F.3d 795 (4th Cir. 1998) ...............................................................30

*Cauthorne v. Am. Home Mortg. Corp.*
    No. 3:08CV84, 2008 WL 4316123 (E.D. Va. Sept. 15, 2008)..........................................14, 15

*Cauvel v. Schwan's Home Serv., Inc.*
    No. 6:10-cv-00012, 2011 WL 573378 (W.D. Va. Feb. 10, 2011)....................................20, 21

*Chapman v. Wal-Mart, Inc.*
    No. 5:20cv00105, 2021 WL 2379810 (W.D. Va. June 10, 2021) ...........................................22

*Cox v. Rumsfeld*
    369 F. Supp. 2d 748 (E.D. Va. 2005) ...............................................................25, 27

*Crawford v. Newport News Indus. Corp.*
No. 4:14cv130, 2018 WL 2943445 (E.D. Va. June 11, 2018)..................................21

*Cutaia v. Radius Engineering Int'l, Inc.*
No. 5:11cv00077, 2013 WL 5491868 (W.D. Va. Oct. 2, 2013).........................15, 16

*Cyberlock Consulting, Inc. v. Information Experts, Inc.*
939 F. Supp. 2d 572 (E.D. Va. 2013) ......................................................................17

*Daniels v. Rumsfeld*
No. Civ. A 4:03CV60, 2004 WL 3436072 (E.D. Va. 2004) .............................28, 29

*Davis v. Comcast Corp.*
No. 1:13-cv-01513, 2015 WL11111066 (E.D. Va. Jan. 26, 2015).........................27

*Dawkins v. SBV, LLC*
No. 1:14CV711, 2016 WL 817371 (M.D.N.C. Feb. 26, 2016) .............................27

*Demetriades v. Bryant*
389 F. App'x 249 (4th Cir. 2010) ...........................................................................15

*Derrick v. Lincoln Nat'l Life Ins. Co.*
No. 6:18-cv-00085, 2020 WL 4352758 (W.D. Va. July 29, 2020) .........................16

*Design & Prod., Inc. v. Am. Exhibitions, Inc.*
820 F. Supp. 727 (E.D. Va. 2011) ..........................................................................17

*Diamond v. Bon Secours Hosp.*
No. WDQ-07-2901, 2009 WL 9055129 (D. Md. Apr. 14, 2009)..........................27

*E.E.O.C. v. Clay Printing Co.*
955 F.2d 936 (4th Cir. 1992) .................................................................................30

*Feldman v. Law Enforcement Assoc. Corp.*
752 F.3d 339 (4th Cir. 2014) .................................................................................28

*Ferguson v. Holder*
No. 1:14-cv-1641, 2015 WL 11117148 (E.D. Va. Feb. 9, 2015) ...........................29

*Fransmart LLC v. Freshii Dev. LLC*
768 F. Supp. 2d 851 (E.D. Va. Mar. 1, 2011).........................................................15

*Freedlander, Inc., The Morg. People v. NCNB Nat'l Bank of N.C.*
706 F. Supp. 1211 (E.D. Va. 1988) ..................................................................18, 19

*Freeman v. Dal-Tile Corp.*
750 F.3d 413 (4th Cir. 2014) .................................................................................30

*Giudice v. Red Robin Int'l, Inc.*
  555 F. App'x 67 (2d Cir. 2014) ........................................................................28

*Greene v. Nat'l Head Start Ass'n, Inc.*
  No. 1:09cv546, 2010 WL 1779677 at \*5 (E.D. Va. Apr. 30, 2010) .......................20

*Haywood v. Locke*
  387 F. App'x 355 (4th Cir. 2010) ......................................................................21

*Hinton v. Va. Union Univ.*
  185 F. Supp. 3d 807 (E.D. Va. 2016) ................................................................27

*Holland v. Wash. Homes, Inc.*
  487 F.3d 208 (4th Cir. 2007) ...........................................................................23

*Jain v. The Cnty. Bd. of Arlington Cnty.*
  No. 1:19-cv-560, 2020 WL 5793426 (E.D. Va. Sept. 28, 2020) ..........................24

*Johnson v. Washington*
  559 F.3d 238 (4th Cir. 2009) ...........................................................................17

*Lauture v. Saint Agnes Hosp.*
  429 F. App'x 300 (4th Cir. 2011) ......................................................................29

*Lewis v. Gibson*
  621 F. App'x 163 (4th Cir. 2015) ......................................................................29

*In re Maco Homes*
  96 F.3d 1439 (4th Cir. 1996) ...........................................................................19

*Martin v. NAES Corp.*, No. 6:12-cv-00058, 2013 WL 5945655 (W.D. Va. Nov. 6, 2013)
  *aff'd* 583 F. App'x 162 (4th Cir. 2014) ........................................................18, 19

*McCormick v. Level 3 Commc'ns, LLC*
  261 F. Supp. 2d 476 (E.D. Va. 2003) ................................................................18

*McDonnell Douglas Corp. v. Green*
  411 U.S. 792 (1973) ...................................................................................21, 27

*McKinley v. Salvation Army*
  192 F. Supp. 3d 678 (W.D. Va. 2016) ...............................................................29

*Middle E. Broad. Networks, Inc. v. MBI Global, LLC*
  No. 1:14-cv-01207, 2015 WL 4571178 (E.D. Va. July 28, 2015) .........................21

*Moore v. Penfed Title, LLC*
  No. 1:20-cv-0867, 2021 WL 2004785 (E.D. Va. May 18, 2021) ...........................21

*Nathan v. Takeda Pharm.*
  890 F. Supp. 2d 629 (E.D. Va. 2012) ..............................................................26, 27

*New v. Thermo Fisher Sci., Inc.*
  No. 1:19cv807, 2022 WL 787954 (M.D.N.C. Mar. 15, 2022) ...............................30

*Newman v. Snap-On Tools*
  No. 87-0475-R, 1988 WL 1099676 (E.D. Va. Feb. 3, 1988) ..................................19

*Nnadozie v. Gensis HealthCare Corp.*
  730 F. App'x 151 (4th Cir. 2018) ..........................................................................30

*Nyimpha v. Ross*
  No. 1:19-cv-258, 2020 WL 819839 (E.D. Va. Feb. 19, 2020) ........................26, 27

*Orbit Corp. v. FedEx Ground Packaging Sys., Inc.*
  No. 2:14cv607, 2016 WL 6609184 (E.D. Va. Nov. 8, 2016)....................15, 16, 17

*Patterson v. City of Chesapeake, Va.*
  No. 2:07cv611, 2008 WL 11381782 (E.D. Va. Sept. 30, 2008)..............................15

*Peary v. Goss*
  365 F. Supp. 2d 713 (E.D. Va. 2005) ...............................................................25, 27

*Perkins v. Int'l Paper Co.*
  936 F.3d 196 (4th Cir. 2019) .................................................................................30

*PNC Bank Nat'l Ass'n v. Dominion Energy Mgmt.*
  No. 3:17cv311, 2018 WL 1768061 (E.D. Va. Apr. 12, 2018).........................16, 17

*Poth v. Russey*
  99 F. App'x 446 (4th Cir. 2004) .......................................................................16, 17

*Robinson v. Loudoun Cnty. Pub. Sch.*
  No. 1:16-cv-1604, 2018 WL 1277736 (E.D. Va. Mar. 9, 2018)............................28

*Scheduled Airlines Traffic Off., Inc. v. Objective Inc.*
  180 F.3d 583 (4th Cir. 1999) .................................................................................17

*Smith v. Strayer Univ. Corp.*
  79 F. Supp. 3d 591 (E.D. Va. 2015) ......................................................................23

*Spruill v. Kip Killmon's Tysons Ford, Inc.*
  No. 1:12-cv-806, 2012 WL 4829339 (E.D. Va. Oct. 10, 2012) .............................27

*Thorpe v. Mechanicsville Concrete, LLC*
  No. 3:10-cv-797, 2012 WL 1028592 (E.D. Va. Mar. 26, 2012).......................22, 25

*Todd v. Blue Ridge Legal Servs. Inc.*
    175 F. Supp. 2d 863 (W.D. Va. 2001) ............................................................18, 19

*Tomasello v. Fairfax Cnty.*
    No. 1:15-cv-95, 2016 WL 165708 (E.D. Va. Jan. 13, 2016)....................................29

*U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*
    472 F. Supp. 2d 787 (E.D. Va. 2007) .....................................................................29

*Valerino v. Holder*
    No. 1:11-cv-1124, 2013 WL 12432290 (E.D. Va. Feb. 20, 2013) ..........................26

*Whalen v. Rutherford*
    No. 3:12CV00032, 2013 WL 3174702 (W.D. Va. June 21, 2013) ..........................15

*Williams v. Harvey*
    No. 4:05CV161, 2006 WL 2456406 (E.D. Va. Aug. 21, 2006) .......................23, 25

*Wright v. Hilldrup Moving & Storage*
    No. 1:16-cv-1349, 2017 WL 2262842 (E.D. Va. May 23, 2017)...........................14

*XL Specialty Ins. Co. v. Truland*
    No. 1:14cv1058, 2015 WL 2195181 (E.D. Va. May 11, 2015)...............................15

*Zimmerman v. Vectronix, Inc.*
    No. 1:17-cv-00299, 2017 WL 6459680 (E.D. Va. Dec. 15, 2017)..........................25

<u>Statutes</u>

Va. Code § 40.1-29 ..................................................................................................20, 21

Virginia Wage Payment Act .............................................................................17, 19, 20

<u>Other Authorities</u>

Fed. R. Civ. P. 56........................................................................................................1, 14

Defendant Zeta Global Corp. ("Defendant," "Zeta," or the "Company"), by and through its undersigned counsel, respectfully submits this Motion for Summary Judgment (the "Motion") pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP 56") seeking an order dismissing the Amended Complaint for Damages (the "Amended Complaint or Am. Compl.") filed by Plaintiff Melissa Racklin ("Plaintiff") in its entirety.

## STATEMENT OF UNDISPUTED FACTS

### I.  THE PARTIES

1. Zeta is a digital marketing and marketing technology company. (Racklin 102).[1]

2. Plaintiff was employed by Zeta in the position of VP, Enterprise Sales from November 12, 2018 until she resigned her employment on January 21, 2022, and at all times worked remotely from Virginia. (Racklin 111, 337; Stoler Decl. Ex. 9).

3. Plaintiff was largely responsible for selling Zeta's proprietary ZX product, which provides digital media solutions to assist companies in acquiring new customers. (Racklin 103-04).

### II.  DONALD STEELE AND CHAD MILLER

4. In March 2017, Zeta hired Donald Steele as its first Chief Revenue Officer ("CRO"). As CRO, Mr. Steele was responsible for, among other things, overseeing Zeta's Enterprise Sales team which was exclusively responsible for bringing new clients (also referred to as "new logos") to the Company. (Steele 10-11; Gerber 30(b)(6) 26-27; Gerber 11-15).

---

[1]References to "Stoler Decl." are to the Declaration of Jonathan Stoler submitted in support of the Motion.  References to "Welsh Decl." are to the Declaration of Sean Welsh in Support of the Motion.  References to "Gerber Decl." are to the Declaration of Steven Gerber in support of the Motion. References to "McCarthy Decl." are to the Declaration of Kevin McCarthy in support of the Motion.  References to "Racklin" are to the transcript pages from the deposition of Melissa Racklin annexed to the Stoler Decl. as Exhibit 1. References to "Gerber" are to the transcript pages from the deposition of Steven Gerber annexed to the Stoler Decl. as Exhibit 2. References to "Gerber 30(b)(6)" are to the transcript pages from Mr. Gerber's deposition as a corporate representative, annexed to the Stoler Decl. as Ex. 3. References to "Lang 30(b)(6)" are to the transcript pages from the deposition of Denise Lang as a corporate representative, annexed to the Stoler Decl. as Ex. 4. References to "Martella" are to the transcript pages from the deposition of Matthew Martella annexed to the Stoler Decl. as Ex. 5.  References to "Steele" are to the transcript pages from the deposition of Donald Steele annexed to the Stoler Decl. as Ex. 6.  References to "Stone" are to the transcript pages from the deposition of Shannon Stone, annexed to the Stoler Decl. as Ex. 7.

5. Upon his arrival at Zeta, Mr. Steele terminated every member of the Enterprise Sales team except Chad Miller, who had been with Zeta since 2012. (Steele 24; Gerber 30(b)(6) 97).

6. During all relevant times, Mr. Miller was employed by Zeta in the position of SVP, Brand Development. (Gerber Decl. ¶ 4). He was considered a very successful salesperson, and one of the Company's most important employees. (Gerber 89, 92-93; Racklin 530).

7. Plaintiff admits that Mr. Miller generated more revenue than she did in every quarter of her employment at Zeta. (Racklin 530-31).

8. During all relevant times, Mr. Miller served in a "hybrid" role responsible for both securing new logos and for overseeing the client relationships in his book of business. (Gerber 89-92).

9. No other ZX salesperson had a hybrid role comparable to Mr. Miller's, as they were all primarily responsible for bringing in new business and then handing off such business to Zeta's personnel responsible for client development. (Gerber 30(b)(6) 215; Stone 47, 93-94).

10. Mr. Miller originally reported to Mr. Steele upon his initial appointment as CRO, but subsequently began reporting to Eric Presbrey, Zeta's President of ZX. (Gerber 91-92).

### III.  MR. STEELE RECRUITS PLAINTIFF

11. Mr. Steele and Plaintiff began discussing the possibility of Plaintiff joining Zeta at various times beginning in 2017. (Racklin 97-100, 490-97; Steele 37-47; Stoler Decl. Ex. 11).

12. Mr. Steele had known Plaintiff since 2011, when he hired her to work for him at Epsilon Data Management, LLC ("Epsilon"), which was his prior employer.  (Racklin 94; Steele 21-22).

13. On or around October 10, 2018, Plaintiff interviewed for a position at Zeta with several people including Mr. Steele and Zeta's President and COO, Steven Gerber. (Racklin 101).

14. Plaintiff admits that she cannot recall what Mr. Gerber specifically said to her during this conversation, but summarily claims that he told her that she would lead Zeta's accounts for T-Mobile and Sprint. (Racklin 68-80; Am. Compl. ¶ 12).

15. Plaintiff also claims that Mr. Steele told her in October 2018 that the T-Mobile, Sprint, and Verizon accounts would be assigned to her (together with Mr. Gerber's alleged statements, the "Alleged Statements"). (Racklin 70-71, 73-74, 78-80).

16. Messrs. Gerber and Steele both deny that they made the Alleged Statements. (Gerber 30(b)(6) 20-22, 24-25, 27-28; Gerber 29-35; Steele 56-59).

17. Plaintiff does not claim that anyone other than Messrs. Gerber or Steele made any statements to her regarding Verizon, Sprint, or T-Mobile during her recruitment. (Racklin 78).

18. Plaintiff admits that there is no record evidence showing that the Alleged Statements were made. (Racklin 71-72, 74-75, 80).

19. Plaintiff admits that she trusts Mr. Steele and does not believe he lied to her when he made the Alleged Statements. (Racklin 94, 96).

20. Plaintiff admits that the only basis for her belief that Mr. Gerber was lying to her during her recruitment is the fact that the Sprint, T-Mobile and Verizon accounts were never "transitioned fully to [her]." (Racklin 146-47).

21.  Plaintiff admits that she learned during her recruitment that Sprint and Verizon's mobile phone division, Verizon Wireless ("VW"), were already assigned to Mr. Miller and concedes that she did not have any expectation that they would be taken away from Mr. Miller if she joined Zeta. (Racklin 72-74, 77, 532-33).

## IV.  PLAINTIFF ACCEPTS ZETA'S OFFER OF EMPLOYMENT

22. On October 12, 2018, Plaintiff received an Offer Letter from Zeta for the position of VP, Enterprise Sales, and admits that she understood she would be responsible for bringing in new logos for the Company. (Racklin 85-86, 151; Stoler Decl. Ex. 9).

23. Significantly, the Offer Letter did not set forth any specific clients or accounts that Plaintiff would be assigned to lead, let alone on which she could expect to work. (Stoler Decl. Ex. 9).

24. Plaintiff admits that she carefully and completely reviewed the Offer Letter, understood it, and accepted its terms by signing it on October 16, 2018. (Racklin 86; Stoler Decl. Ex. 9).

25. By signing the Offer Letter, Plaintiff agreed, among other things: (i) to "comply with and be bound by the operating policies, procedures and practices of the Company"; and (ii) that "[t]his offer letter sets forth the entire agreement and understanding between the Company and you relating to your offer of employment and **supersedes all prior verbal discussions between us**" (the "Merger Clause"). (Racklin 87, 90; Stoler Decl. Ex. 9, at ¶ 1, 9(d)) (emphasis added).

26. Plaintiff admits that she never asked Messrs. Gerber or Steele to revise the Offer Letter to state that she would be assigned Verizon, T-Mobile, or Sprint or that her account assignments would not change during her employment. (Racklin 88-89).

27. Plaintiff admits that it is common in the sales industry for employers to reassign accounts among sales team members from time to time and to assign accounts based upon a sales representative's relationship with the client.  (Racklin 75, 216-17).

28. Plaintiff never secured any sales revenue from Sprint or T-Mobile while employed at Zeta and, thus, was not entitled to any commissions on either account. (Racklin 138-39, 147-49).

**V. PLAINTIFF'S 2019 COMMISSION PLAN**

29. It is undisputed that Plaintiff, like other Zeta salespeople, received a new commission plan for every calendar year. (Racklin 151; Stone 94).

30. On March 10, 2019, Plaintiff signed her first commission plan with Zeta (the "2019 Plan") which stated that it was effective only between January 1 and December 31, 2019. (Racklin 151, 155; Stoler Decl. Ex. 12).

31. Pursuant to the 2019 Plan, Zeta reserved the right to modify and interpret the plan's terms. (Stoler Decl. Ex. 12, at ZETA00000034).

32. Because Plaintiff was hired by Zeta to generate new business, the 2019 Plan provided, in

relevant part, that Plaintiff would be eligible to receive commissions in the amount of 5% of Gross Recognized Revenue ("GRR") on ZX deals she brought to the Company. (Stoler Decl. Ex. 12; Racklin 151, 155-56, 508).

33. Plaintiff admits that during her employment: (i) she could earn commissions on any deal with any client she brought to Zeta; (ii) that she was assigned a list of approximately twenty accounts to prospect; and (iii) the amount of commissions she could earn each month was unlimited. (Racklin 508-10, 534-36).

34. Mr. Miller had a different compensation plan than all other Zeta salespeople, including Plaintiff, because of his unique hybrid role. (Gerber 30(b)(6) 214-15; Martella 112).

35. Mr. Miller's compensation package provided, in relevant part, that he could earn commissions on all revenue generated from a limited set of assigned clients but, unlike Plaintiff, the amount of commissions he could earn each month was capped. (Racklin 527-30; Gerber 30(b)(6) 97-98, 210-11, 214-15; Stoler Decl. Exs. 13-14).

## VI. PLAINTIFF PROSPECTS VERIZON FIOS

36. On February 7, 2019, Plaintiff notified Messrs. Gerber, Steele, and Sean Welsh (her direct manager at the time) that her contact at Verizon Fios ("VF"),[2] Anne Hogan, was interested in doing business with Zeta. Plaintiff insisted that this opportunity would be distinct from the work that Mr. Miller was already performing with VW through his Verizon contact, John Edwards. (Stoler Ex. 15; Racklin 191-93, 197-98; Stone 174-75; Steele 84-85; Gerber 67-68).

37. Although Zeta usually does not allow two salespersons to cover the same client account, Mr. Gerber allowed Plaintiff to pursue a "pilot" (or short-term initial test contract) with VF because he viewed VF, like VW, as an independent business unit within Verizon. (Racklin 192, 202, 513;

---

[2] VF is Verizon's cable and internet division.

Steele 81-83; Gerber 30(b)(6) 64-65, 69; Gerber 222-23).

38. In mid-May 2019, Verizon restructured and collapsed VF into its existing VW business unit. (Stoler Decl. Ex. 16; Racklin 203-06; Gerber 30(b)(6) 104-05).

39. Plaintiff admits that, as a result of the restructuring: (i) Verizon assigned Mr. Edwards – who was already Mr. Miller's client contact – to lead its ongoing negotiations regarding a potential deal to expand VW's business with Zeta; (ii) Verizon told Zeta that it wished to negotiate and deal with only one Zeta team going forward, which was Mr. Miller's team since VW was already his account; and (iii) Plaintiff's VF contact, Ms. Hogan, was no longer the lead decisionmaker in this process. (Stoler Decl. Ex. 15; Racklin 203-07, 210, 215-16; Gerber 67-74).

40. Accordingly, and because VW was Mr. Miller's account, Mr. Gerber decided that Mr. Miller would be exclusively responsible for the VW account and for negotiating a deal that Zeta (through Mr. Miller) and VW (through Mr. Edwards) had already been discussing.  (Racklin 212-17, 220; Gerber 30(b)(6) 69-71, 99; Gerber 67-74; Steele 98-99, 237-39; Stoler Decl. Ex. 17).

41. In or around early July 2019, Mr. Edwards informed Zeta that Verizon would not move forward with the VF pilot that Plaintiff had been pursuing. (Gerber 30(b)(6) 68-72; Gerber 67-68).

42. Plaintiff admits that she had no further involvement with Verizon after July 2019 and that she never closed a deal with any division of Verizon while employed at Zeta. (Racklin 203, 220, 270, 275-76, 514-15).

## VII. ZETA AMENDS THE 2019 PLAN TO RECOGNIZE PLAINTIFF'S EFFORTS

43. Pursuant to the terms of the 2019 Plan, Plaintiff was not entitled to earn commissions on any Verizon deals that she did not bring to Zeta.  (Racklin 219-223, 230-31, 508).

44. However, in an effort to reward Plaintiff for her prior efforts with VF and in anticipation of Mr. Miller closing a deal with VW in 2019, Mr. Gerber offered to amend Plaintiff's 2019 Plan, in relevant part, to make her eligible for commissions amounting to 3% of GRR over the "run rate"

on ZX deals that any Zeta sales representative closed with Verizon "for a period of up to three years" (the "2019 Amendment").[3] (Racklin 224-26, 230-31; Gerber 30(b)(6) 76-78, 115; Gerber 67-74; Steele 155-56; Stoler Decl. Ex. 18).

45. Mr. Gerber's decision was "highly unusual" and a departure from Zeta's compensation policy and standard practices. (Gerber 30(b)(6) 114-15, 143, 167-68; Gerber 73-74, 235).

46. Plaintiff admits that she reviewed the 2019 Amendment's terms as early as May 24, 2019, was asked for input regarding its contents, agreed to and signed it on June 25, 2019, and returned a copy to Zeta on July 1, 2019. (Racklin 225, 232-36; Steele 111-12; Stoler Decl. Exs. 18-20).

47. Plaintiff admits that she would not have been entitled to any commissions on any VW deal that Mr. Miller closed for Zeta without the 2019 Amendment. (Racklin 223-24, 230-31, 242-43).

48. In March 2020, Mr. Miller closed the deal he had been negotiating with Mr. Edwards at VW, which was intended to run for 36 months (the "VW Deal"). (Racklin 270; Stoler Decl. Ex. 31).

## VIII. ZETA REORGANIZES ITS SALES FORCE IN MARCH 2020

49. Mr. Steele was not as successful as Zeta originally hoped. (Gerber 15-19, 46).

50. As a result, in March 2020, Mr. Gerber removed Mr. Steele as CRO, dissolved the Enterprise Sales team, and terminated every member except Plaintiff, Mr. Welsh, Mary Schlafly, and Jay Rogers. (Gerber 30(b)(6) 132-35, 192-93; Gerber 20, 54-56, Steele 156-58).

51. Mr. Gerber assigned Mr. Welsh, Ms. Schlafly, and Plaintiff to a new ZX sales team reporting to Matt Martella, who had been hired as President of ZX in January 2020. (Racklin 106-08; Martella 19; Gerber 30(b)(6) 133-34; Gerber 56-57, 99).

52. Mr. Gerber hired Mr. Martella, in part, to move away from Mr. Steele's traditional method of sales and, instead, adopt a more modern, analytics-driven approach. (Gerber 50, 104-05, 112, 117-

---

[3] The term "run rate" was defined as the monthly average of revenues received from Verizon in the previous year (*i.e.*, June 2018 to May 2019). (Stoler Decl. Ex. 18).

18, 281-83; Gerber 30(b)(6) 182-83; Steele 160; Racklin 560; Martella 38-39).

53. Mr. Gerber decided not to terminate Plaintiff in March 2020 because he still believed in her ability to generate revenue. (Gerber 54-57, 209; Gerber 30(b)(6) 134-35).

54. Mr. Miller continued to work in his hybrid role and, while he also reported to Mr. Martella albeit for a short period of time, was subsequently assigned to report to Tom Walsh, Zeta's head of strategic partnerships. (Martella 112-13; Gerber 140).

## IX. PLAINTIFF NEGOTIATES HER 2020 COMMISSION PLAN

55. On April 9, 2020, Zeta presented Plaintiff with a copy of her proposed 2020 commission plan (the "Proposed Plan"). The Proposed Plan eliminated the "run rate" concept and made Plaintiff eligible for commissions on all Verizon business at a rate of 1% of the GRR collected from Verizon for 2020 – even though Verizon was not her account. (Stoler Decl. Ex. 21; Racklin 263-64, 275).

56. This commission calculation was closely equivalent to the 3% commissions over the run rate that Plaintiff received under the 2019 Amendment. Mr. Gerber testified that the change was necessary because the VW Deal's final terms were materially different than what had been originally anticipated, rendering the run rate concept difficult to apply. (Gerber 30(b)(6) 115-17).

57. Plaintiff refused to sign the Proposed Plan and subsequently negotiated its terms for two weeks resulting in a number of changes to the Proposed Plan that favored Plaintiff. Ultimately, the parties agreed that: (i) Plaintiff would be eligible to earn 1.5% of Verizon GRR, which included the entirety of the VW Deal's 36 month term; and (ii) Plaintiff's commissions on Verizon deals would be calculated based upon recognized (*i.e.,* billed) revenue rather than revenue actually collected. (the "2020 Plan"). (Racklin 234-36, 284-286, 290-91, 505; Gerber 246-47; Gerber 30(b)(6) 115-17; Stoler Decl. Exs. 21-31).

58. Plaintiff read the 2020 Plan before she signed it, understood its terms, and knew that it was effective between January 1 and December 31, 2020. (Racklin 293, 298; Stoler Decl. Ex. 31).

## X.   MR. MARTELLA BUILDS ZX SALES AND DEVELOPS CONCERNS WITH PLAINTIFF'S PERFORMANCE IN 2020

59. In 2020, Mr. Martella hired four new ZX salepeople: (i) Cameron Roegner; (ii) Rick Winnard; (iii) Eric Zaner; and (iv) Matthew Walters. (Martella 73, 132-33; Stoler Decl. Exs. 32-35).

60. Mr. Martella initially recommended that Messrs. Zaner, Winnard, and Walters be eligible to receive a $20,000 New Logo Bonus ("NLB") for each new logo they brought in during the 2020 calendar year in an effort to incentivize them. (Martella 138-42; Stoler Decl. Exs. 36-37).

61. However, Zeta never included a NLB in Messrs. Zaner, Winnard, and Walters' commission plans or offer letters and they never received a NLB. (Stoler Decl. Exs. 33-35, 38-43, 55).

62. Messrs. Winnard and Zaner were ineffective in their roles and, while Mr. Martella considered placing them on a performance improvement plan ("PIP"), they resigned before he did so. (Martella 74, 135-36, 142, 179, 245, 319).

63. In the summer of 2020, Mr. Martella began to develop serious concerns regarding Plaintiff's performance. (Martella 296-97).

64. Under his management, Mr. Martella generally expected all existing ZX salespersons to close 4-6 deals per year. (Martella 72).

65. As of August 2020, and despite being employed by Zeta for two years, Plaintiff had only closed one deal with one client, Charter Communications ("Charter"). (Martella 70; Stoler Decl. Ex. 44).

66. Between August and December 2020, Mr. Martella considered placing Plaintiff on a PIP and possibly terminating her employment if her sales performance did not improve. Instead, Mr. Martella ultimately decided to hold off on taking any action and to give Plaintiff more time to improve. (Martella 301-05, 311-13; Lang 30(b)(6) 26; Stoler Decl. Exs. 45-49).

67. In December 2020, Mr. Welsh resigned due, in large part, to Mr. Martella's management style, their differing sales philosophies, and related difficulties in working together. (Welsh Decl. ¶ 50).

## XI. **PLAINTIFF COMPLAINS TO ZETA'S HR IN DECEMBER 2020**

68. On December 4, 2020, Plaintiff emailed Denise Lang, acting head of Human Resources ("HR") for Zeta, to complain that she heard that Messrs. Gerber and Martella had criticized her sales approach outside of her presence. (Racklin 686, 688-93, 698; Stoler Decl. Ex. 50).

69. During a follow-up call, Plaintiff complained to Ms. Lang for the first time that she was the only member of her team not selected to present during a July 2020 account review (the "July 2020 AR").[4] (Racklin 704, 710-11).

70. Plaintiff admitted at her deposition that her claim that she was the only salesperson not allowed to present at the July 2020 AR was false and also admitted that other ZX sales team members – including male members – did not present at every account review. (Racklin 709, 715-21, Stoler Decl. Exs. 51-52).

71. Ms. Lang subsequently gathered information about how presenters are selected for account reviews, shared that information with Plaintiff, and offered to find out more. However, Plaintiff directed Ms. Lang to cease making any further inquiries. (Stoler Decl. Ex. 51, 53; Racklin 725).

72. The record is devoid of any evidence that Mr. Martella knew about Plaintiff's December 2020 complaint before Plaintiff commenced this action. (Martella 203; Racklin 704-05, 724-25, 729).

## XII. **PLAINTIFF'S 2021 COMMISSION PLAN**

73. On March 29, 2021, Plaintiff agreed to the terms of her 2021 commission plan (the "2021 Plan"), which contained the same terms as her 2020 Plan with respect to her Verizon commissions. (Racklin 295-96, 298; Stoler Decl. Ex. 54).

74. Like the 2020 Plan, the 2021 Plan advised Plaintiff that: (i) she would not be eligible to earn commissions if she was not "in good standing" on the payment date; and (ii) that Zeta reserved the

---

[4] An account review was a meeting where members of the ZX sales team made a detailed "deep dive" presentation regarding a subset of accounts they are pursuing to cross-functional members of Zeta's senior leadership team. (Racklin 707-08, Martella 180-81).

right to modify and interpret the plan's terms.[5] (Stoler Decl. Exs. 31, 54).

## XIII. <u>THE ZX SALES TEAM CONTINUES TO DEVELOP IN 2021</u>

75. In early 2021, Mr. Martella hired a ZX salesperson, Tim Brooke, and a woman with ZX sales responsibilities named Mollisa Silver. (Martella 129-31, 146-47, 157; Stoler Decl. Exs. 56-57).

76. In March 2021, Zeta acquired a company called Kinetic Data ("Kinetic"), which was owned by Kevin McCarthy. (Martella 73, 116-17; Racklin 582; Stoler Decl. Ex. 57).

77. Mr. McCarthy became SVP of Business Development on the ZX team and ZX salespeople, including Plaintiff, began reporting to him. (Racklin 108).[6]

78. Matt Mistretta also joined the ZX sales team from Kinetic. (Martella 129; Stoler Decl. Ex. 57).

79. At the time of their respective hires, Plaintiff received 75,000 Restricted Share Units ("RSUs") while Mr. Brooke received 50,000 RSUs and Mr. Mistretta received 15,000 RSUs. (Stoler Decl. Exs. 9, 56, 58).

80. In April 2021, Mr. McCarthy hired another ZX salesperson, Michael Von Eyser. (Martella 132, 152).

81. The record shows that several men who worked with Mr. McCarthy and/or Mr. Martella complained about their management styles, demeanor and sales philosophies. (Racklin 580-600; Gerber 112; Stoler Decl. Exs. 59-62; Welsh Decl. ¶¶ 9-12, 40-51).

82. Mr. Martella considered neither Mr. Von Eyser nor Mr. Brooke to be strong sellers and thought about placing both of them on a PIP. Mr. Von Eyser was placed on a PIP and resigned a week before Mr. McCarthy planned to terminate him and Mr. Brooke was placed on a performance development plan. (Martella 245; McCarthy Decl. ¶¶ 28-29, 32-33).

---

[5] The 2021 Plan defined "in good standing" as "not subject to any disciplinary proceedings, have [*sic*] not received any disciplinary sanctions and/or *are not subject to performance management*." (Stoler Decl. Ex. 54, at ZETA00000060) (emphasis added). The 2021 Plan was effective between January 1 and December 31, 2021. (*Id.*).
[6] Mr. McCarthy reported to Mr. Martella, who remained President of ZX and focused on strategic direction rather than managing individual sellers directly. (Martella 93, 117-18; Gerber 120-21).

## XIV. **PLAINTIFF'S POOR PERFORMANCE CONTINUES IN 2021**

83. Plaintiff's inability to close deals continued into 2021. (Martella 207-17, 296-97).

84. On January 14, 2021, Mr. Martella and Plaintiff discussed her performance issues and the possibility of an internal transfer, but Plaintiff declined. (Martella 296-97; Stoler Decl. Ex. 63).

85. On April 22, 2021, Mr. Martella finalized a PIP for Plaintiff in consultation with Zeta's HR but did not deliver it because he wanted to give Mr. McCarthy sufficient time to assess her performance for himself. (Stoler Decl. Ex. 64; Martella 242-43; McCarthy Decl. ¶¶ 14-16).

86. It is undisputed that during her entire employment at Zeta, Plaintiff closed deals with only two clients: (i) Charter; and (ii) Cox Communications. (Martella 70-71; Stoler Decl. Exs. 44, 65).

87. Plaintiff admits that she declined: (i) job opportunities with digital marketing companies Claritas and R2i in September 2020; and (ii) an opportunity to join R2i as CRO in March 2021. Plaintiff admits that she turned these opportunities down because she wanted to stay at Zeta. (Racklin 367-69, 758-65; Stoler Decl. Ex. 66-68).

## XV. **PLAINTIFF COMMENCES INDEFINITE PTO**

88. Mr. McCarthy ultimately agreed with Mr. Martella's assessment of Plaintiff's performance. (McCarthy Decl. ¶¶ 17-22, 25).

89. Accordingly, Mr. Martella decided to formally place Plaintiff on a PIP and set a meeting with Plaintiff for July 7, 2021 to discuss the same. Plaintiff failed to attend that meeting. (Lang 30(b)(6) 26-27; Martella 241-42; Gerber 155-57; Stoler Decl. Ex. 69).

90. On July 9, Plaintiff's counsel delivered a demand letter to Zeta (the "Demand Letter"), which set forth, in part: (i) a variety of threatened claims against Zeta; (ii) a request that Messrs. Martella and McCarthy have no direct communication with Plaintiff; and (iii) a cash settlement demand in exchange for Plaintiff's employment separation and release of claims. (Stoler Decl. Ex. 70).

91. On July 9, 2021, Zeta retained Brian Fong of Sheppard, Mullin, Richter & Hampton LLP

("Sheppard Mullin") to investigate Plaintiff's claims. (Lang 30(b)(6) 14; Gerber 267-68; Fong Decl. ¶ 6).

92. Plaintiff admits that, on July 12, 2021, she unilaterally commenced taking paid time off ("PTO") without receiving advance approval and provided no date on which she planned to return, which was in violation of Zeta policy. (Racklin 302-04, 308; Stoler Decl. Ex. 10).[7]

93. Plaintiff admits that she remained on unapproved PTO until July 29, 2021 and was paid her salary during this time even though she was not performing any work. (Racklin 307).[8]

94. On July 23, 2021, Mr. Fong notified Plaintiff's counsel that after completing his initial investigation of Plaintiff's claims, he was unable to substantiate any of them. (Fong Decl. ¶ 9, Ex. 2; Lang 30(b)(6) 14-15).

95. On July 28, 2021, Plaintiff's counsel: (i) provided documents to Mr. Fong that Plaintiff believed supported her claims, as well as the names of certain witnesses; and (ii) again suggested that the parties end their employment relationship for a cash settlement. (Fong Decl. Ex. 3).

96. Zeta agreed to conduct a further investigation of Plaintiff's claims. (Racklin 338-40; Lang 30(b)(6) 14-15, 17; Fong Decl. Ex. 4).

97. In early August 2021, Plaintiff's counsel contacted Mr. Fong to inquire why Plaintiff had not received her June 2021 commission payment, which was scheduled to be paid on or around July 30, 2021. Mr. Fong advised Plaintiff's counsel that Plaintiff was not eligible to earn commissions because she was not in good standing under the 2021 Plan. (Fong Decl. ¶ 16; Lang 30(b)(6) 22-25; Stoler Decl. Ex. 54 at ZETA0000060).

98. On November 3, 2021, Sheppard Mullin: (i) notified Plaintiff's counsel that its investigation

---

[7] It is undisputed that Plaintiff had access to Zeta's 2021 employee handbook and that the handbook states that employees: (i) must receive approval to take PTO; and (ii) cannot take more than two consecutive weeks of PTO without approval from the Company's COO. (Racklin 305, 481-85; Stoler Decl. Ex. 10 at ZETA00000250-51).
[8] On July 29, 2021, Zeta placed Plaintiff on unpaid administrative leave pursuant to its written policy, a status she maintained until she resigned from her employment on January 21, 2022. (Racklin 307-08, 337; Fong Decl. Ex. 4).

found no basis to deviate from Mr. Fong's initial conclusion; and (ii) reminded Plaintiff's counsel that Plaintiff had violated Zeta's PTO policy and was ineligible to earn commissions because she was not in "good standing" under the 2021 Plan. (Racklin 330-37; Stoler Decl. Ex. 71).

99. Plaintiff admits that she did not, and was not willing, to return to work through this time if she was required to continue reporting to Messrs. Martella and McCarthy. (Racklin 328-29).

100. On January 21, 2022, Plaintiff resigned from Zeta to start a new job with the digital marketing firm Data Axle. (Racklin 337-38, 342-43, 467, 751-52).

101. Plaintiff failed to report to work at Zeta since commencing her PTO on July 12, 2021 and through her resignation date on January 21, 2022. By that time, Plaintiff had not had any contact with Messrs. Martella or McCarthy in 6 months. (Racklin 751-52).

102. It is also undisputed that, between July 29, 2021 and January 21, 2022 Plaintiff: (i) was on unpaid administrative leave; (ii) did not perform any work; and (iii) neither she nor her representatives ever informed Zeta that she was willing to return to work. (Racklin 307, 335-37).

103. Plaintiff filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") on October 26, 2021. (Stoler Decl. Ex. 72).

## ARGUMENT[2]

## I.  PLAINTIFF'S FII CLAIM IS TIME-BARRED AND OTHERWISE MERITLESS

Plaintiff's fraud in the inducement ("FII") claim, which is based entirely upon the Alleged Statements, is time-barred and without merit. Fraud claims in Virginia, including FII claims, are subject to a two-year statute of limitations and accrue "when the fraud is discovered or by the

---

[9] Pursuant to FRCP 56, summary judgment is appropriate where "the record shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Hilldrup Moving & Storage*, No. 1:16-cv-1349, 2017 WL 2262842, at *3 (E.D. Va. May 23, 2017) (quoting Fed. R. Civ. P. 56(c)). "To defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, 'mere speculation,' 'the building of one inference upon another,' the 'mere existence of a scintilla of evidence,' or the appearance of some 'metaphysical doubt' concerning a material fact." *Cauthorne v. Am. Home Mortg. Corp.*, No. 3:08CV84, 2008 WL 4316123, at *1 (E.D. Va. Sept. 15, 2008) (quoting *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006)).

exercise of due diligence reasonably should have been discovered." *Whalen v. Rutherford*, No. 3:12CV00032, 2013 WL 3174702, at *3-4 (W.D. Va. June 21, 2013).; *XL Specialty Ins. Co. v. Truland*, No. 1:14cv1058, 2015 WL 2195181, at *18 (E.D. Va. May 11, 2015). Here, the undisputed record shows that Plaintiff became aware that she would not be assigned to lead the T-Mobile account on March 19, 2019 and that Verizon would be exclusively assigned to Mr. Miller by July 2019. (SUF ¶ 42; Stoler Decl. Ex. 73).[10] However, Plaintiff did not commence the instant action until August 13, 2021. (ECF No. 1). Accordingly, Plaintiff's FII claim at least with respect to Messrs. Gerber and Steele's alleged promises regarding Verizon and T-Mobile is time-barred. *See Demetriades v. Bryant*, 389 F. App'x 249, 250 (4th Cir. 2010); *Patterson v. City of Chesapeake, Va.*, No. 2:07cv611, 2008 WL 11381782, at *2 (E.D. Va. Sept. 30, 2008).

Even if any portion of Plaintiff's FII claim is timely, Plaintiff cannot satisfy her burden. To prevail on a FII claim in Virginia, a plaintiff must prove the following three elements by *clear and convincing evidence*:[11] (1) the defendant made a material misrepresentation for the purpose of procuring a contract; (2) the plaintiff reasonably relied on the misrepresentation; and (3) the plaintiff was induced by the misrepresentation to enter into the agreement." *Fransmart LLC v. Freshii Dev. LLC*, 768 F. Supp. 2d 851, 864 (E.D. Va. Mar. 1, 2011). "[T]he general rule is that fraud must be related to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." *Cutaia v. Radius Engineering Int'l, Inc.*, No. 5:11cv00077, 2013 WL 5491868, at *3 (W.D. Va. Oct. 2, 2013). There is simply no evidence in the record, let alone clear and convincing evidence, that supports Plaintiff's FII claim.

Plaintiff cannot satisfy the first element of her FII claim because the Alleged Statements

---

[10] References to "SUF" are to the Statement of Undisputed Facts set forth *supra*.
[11] "Clear and convincing evidence is an elevated burden of proof requiring the plaintiff to "establish in the trier of fact *a firm belief or conviction* that a knowingly false statement was made[.]" *Id.; Orbit Corp. v. FedEx Ground Packaging Sys., Inc.*, No. 2:14cv607, 2016 WL 6609184, at *5 (E.D. Va. Nov. 8, 2016); (emphasis original).

are the very kind of "unfulfilled promises or statements as to future events" that are not actionable under Virginia law. *See Derrick v. Lincoln Nat'l Life Ins. Co.*, No. 6:18-cv-00085, 2020 WL 4352758, at *4 (W.D. Va. July 29, 2020); *Orbit Corp.*, 2016 WL 6609184 at *8; *Cutaia*, 2013 WL 5491868 at *3. Moreover, Plaintiff cannot show that the Alleged Statements were knowingly false. Indeed, Plaintiff admits that she does not believe that Mr. Steele lied to her when he made the Alleged Statements. (SUF ¶ 19). Plaintiff also admits that the only basis for her belief that the Alleged Statements were knowingly false is the fact that none of the accounts in question were "transitioned fully" to her after she joined Zeta. (SUF ¶ 20).[12] This speculative argument falls woefully short of establishing through clear and convincing evidence that the Alleged Statements were knowingly false. *See Poth v. Russey*, 99 F. App'x 446, 456 (4th Cir. 2004); *Derrick*, 2020 WL 4352758, at *4.

Plaintiff also cannot satisfy the second element of her FII claim because there is no clear and convincing evidence in the record showing that Plaintiff's reliance on the Alleged Statements was reasonable and justified. Virginia courts have made it clear that "prudent investigation serves as the touchstone of reasonableness." *PNC Bank Nat'l Ass'n v. Dominion Energy Mgmt.*, No. 3:17cv311, 2018 WL 1768061, at *11 (E.D. Va. Apr. 12, 2018). Significantly, "examples of unreasonable reliance include . . . where one relies upon an oral statement that is contrary to a written statement in his possession." *Id.* (internal citations omitted). Plaintiff's own admissions undermine her claim that she reasonably relied upon the Alleged Statements. More specifically, Plaintiff admits that: (i) she received the Offer Letter after the Alleged Statements were made; (ii) she read and understood the Offer Letter before she signed it including, but not limited to, the Merger Clause; (iii) she never asked Messrs. Gerber, Steele or anyone else to amend the Offer

---

[12] Plaintiff makes this allegation even though she admits that she was permitted to lead VF and that she considered herself the "sales lead" for Sprint. (Racklin 133-35, 615; Stoler Decl. Ex. 74).

Letter to include the Alleged Statements; and (iv) customer accounts are commonly moved from one salesperson to another in her industry. (SUF ¶ 27). These admissions make it clear that, even if the Alleged Statements were made, Plaintiff's reliance on them was not reasonable or justified. *See Johnson v. Washington*, 559 F.3d 238, 245 (4th Cir. 2009); *Poth*, 99 F. App'x at 455 n.9; *PNC Bank*, 2018 WL 1768061 at *17; *Design & Prod., Inc. v. Am. Exhibitions, Inc.*, 820 F. Supp. 727, 742 (E.D. Va. 2011).[13]

Finally, Plaintiff cannot establish the third element of her FII claim because there is no clear and convincing evidence that the Alleged Statements actually induced her to join Zeta. Indeed, the record shows that Plaintiff was primarily motivated to move from Epsilon to Zeta by the prospect of earning more money at Zeta rather than working with clients she was already serving at Epsilon. (Stoler Decl. Ex. 11; Welsh Decl. ¶ 21; Steele 35-36; Gerber 28-29); *see, e.g.*, *U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787, 800 (E.D. Va. 2007).

## II.  PLAINTIFF'S BREACH OF CONTRACT AND VWPA CLAIMS ARE MERITLESS

To prevail on a breach of contract claim, a plaintiff must establish: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of the obligation; and (3) an injury or harm to the plaintiff caused by the defendant's breach." *Cyberlock Consulting, Inc. v. Information Experts, Inc.*, 939 F. Supp. 2d 572, 578 (E.D. Va. 2013). As discussed below, Plaintiff's breach of contract and associated Virginia Wage Payment Act ("VWPA") claims are without merit.

## A.  Zeta Paid Plaintiff's Verizon Commissions In Accordance With Her Commission Plans

Plaintiff first claims that Zeta breached the 2019 Plan by changing her Verizon commission eligibility from 5% to 3% in June 2019, and then to 1.5% in April 2020. (Am. Compl. ¶ 155). This

---

[13] Virginia law is also clear that where, as here, the statements at issue are vague or indefinite, a Plaintiff cannot be deemed to have reasonably relied upon such statements. *See Scheduled Airlines Traffic Off., Inc. v. Objective Inc.*, 180 F.3d 583, 589-590 (4th Cir. 1999); *Orbit Corp.*, 2016 WL 6609184 at *4, *8.

claim is completely without merit. The undisputed record shows that:

- Pursuant to the 2019 Plan, Plaintiff was only eligible to earn 5% commissions on deals that she, herself, brought to Zeta. Plaintiff admits she was ineligible to earn commissions on Verizon under the 2019 Plan because she did not secure any Verizon deals. (SUF ¶ 47);

- In a good-faith effort to mollify Plaintiff and reward her failed attempt to secure a deal with VF, Zeta offered Plaintiff the 2019 Amendment, which modified the 2019 Plan and allowed Plaintiff to earn 3% of Verizon revenue over the run rate even though Verizon was not her account. (SUF ¶ 44). Plaintiff voluntarily executed the 2019 Amendment on June 25, 2019 and all of her 2019 Verizon commissions were paid to her in accordance with its terms (SUF ¶ 46, Racklin 182-83); and

- On April 23, 2020 Plaintiff voluntarily executed the 2020 Plan.[14] (SUF ¶ 58). Although Plaintiff still performed no work on Verizon in 2020, the 2020 Plan rendered her eligible to earn 1.5% of *all* GRR for Verizon, not just revenue over the run rate. (SUF ¶ 57). All of Plaintiff's 2020 Verizon commissions were paid to her in accordance with the terms of the 2020 Plan.[15]

In a desperate attempt to invalidate the 2020 Plan, Plaintiff alleges that she signed it under duress. (Am. Compl. ¶ 42). "Economic duress is not readily accepted as an excuse to bar the enforcement of a contract under Virginia law." *Freedlander, Inc., The Morg. People v. NCNB Nat'l Bank of N.C.*, 706 F. Supp. 1211, 1212 (E.D. Va. 1988). To establish duress, the plaintiff must show "the application of undue pressure in a contractual bargaining process through the use of improper threats or physical force." *Martin v. NAES Corp.*, No. 6:12-cv-00058, 2013 WL 5945655, at *5 (W.D. Va. Nov. 6, 2013); *aff'd* 583 F. App'x 162 (4th Cir. 2014). Such threats or force must be sufficient to "prevent a plaintiff from exercising his free will." *Todd v. Blue Ridge Legal Servs. Inc.*, 175 F. Supp. 2d 857, 863 (W.D. Va. 2001). However, "a party who, without force or intimidation and with full knowledge of all the facts of the case, accepts on account of an

---

[14] The 2020 Plan superseded the 2019 Plan as amended, and stated that it remained in effect between January 1 and December 31, 2020. (Stoler Decl. Exs. 12, 20, 31; SUF ¶ 58).

[15] During the entirety of this litigation, Plaintiff could only identify one instance, which was in March 2020, where she claims her commissions were underpaid. (Racklin 515-20). However, as Zeta's Vice President of Finance, Satish Ravella, testified, Plaintiff was paid properly at all times including in March 2020 and there is no evidence in the record to suggest otherwise. (Stoler Decl. Ex. 8 at 32-33, 39-55); *see, e.g.*, *McCormick v. Level 3 Commc'ns, LLC*, 261 F. Supp. 2d 476, 480-83 (E.D. Va. 2003).

unlitigated and controverted demand a sum less than what he claims and believes to be due him, and agrees to accept that sum in full satisfaction," cannot show that she was under duress when she signed the contract at issue. *Freedlander*, 706 F. Supp. at 1216.

Here, Plaintiff does not even allege, much less show, that Mr. Gerber made improper threats or used physical force to induce Plaintiff to sign the 2020 Plan. Instead, Plaintiff appears to contend that Mr. Gerber spoke to her in a "sharp, hostile and condescending" tone during a phone call on April 10, 2020 when they first discussed the 2020 Plan (the "April 10 Call"). (Am. Compl. ¶¶ 42, 59). Plaintiff admits that she was not bothered by the content of Mr. Gerber's alleged statements during the April 10 Call, testifying that "[i]t's not what he said, it's how he said it." (Racklin 640). Setting Mr. Gerber's alleged "tone" aside, it is undisputed that Plaintiff refused to sign the 2020 Plan for two weeks after the April 10 Call, during which time Plaintiff admits that she was able to successfully negotiate improvements to the terms of the 2020 Plan, including an increase to her Verizon commission percentage and how it would be calculated. Based on these facts, Plaintiff simply cannot show that she signed the 2020 Plan under duress. *See Todd*, 175 F. Supp. 2d at 863-65; *In re Maco Homes*, 96 F.3d 1439, 1439 (4th Cir. 1996); *Martin*, 2013 WL 5945655 at *5; *Newman v. Snap-On Tools*, No. 87-0475-R, 1988 WL 1099676, at *2-3 (E.D. Va. Feb. 3, 1988).[16]

**B.  Zeta Paid Plaintiff All Salary And Commissions She Was Owed**

Plaintiff next claims that Zeta breached her Offer Letter and the 2021 Plan and violated the VWPA when it did not pay her salary or commissions while she was on unpaid administrative

---

[16] Plaintiff also claims she signed the 2019 Amendment under duress because Mr. Gerber told her that she would not earn any Verizon commissions unless she signed it. (Racklin 40-41, 242-44; Am. Compl. ¶ 34). Plaintiff admits, however, that Mr. Gerber was right because the 2019 Amendment rendered her *eligible* for Verizon commissions that she was ineligible to receive under the 2019 Plan. (Racklin 230-31, 242-44). Plaintiff also admits that she considered the 2019 Amendment for over a month before returning it to Zeta and had the opportunity to provide her input regarding its contents, undermining any claim of duress. (Racklin 232-36; Stoler Decl. Exs. 19-20, 75); *Todd*, 175 F. Supp. 2d at 863-65.

leave between July 29, 2021 and January 21, 2022 (the "ULOA Period"). As an initial matter, Plaintiff was not entitled to be paid any salary or commissions during the ULOA Period because it is undisputed that she did not perform any work during that period. (SUF ¶¶ 99, 101-02).

Moreover, Zeta's decision not to pay Plaintiff her salary during the ULOA Period is entirely consistent with the Offer Letter and the Company's policies. The Offer Letter states that Plaintiff was required to "comply with and be bound by the operating policies, procedures, and practices of the Company" during her employment at Zeta. The undisputed record shows that between July 12, 2021 and the date that the ULOA Period began, Plaintiff: (i) violated Zeta's PTO policy by taking more than two consecutive weeks of unapproved PTO; (ii) refused to report to work; and (iii) refused to have any contact with her supervisors. Therefore, Zeta did not breach the Offer Letter or the VWPA when it did not pay Plaintiff her salary during the ULOA Period. *See Cauvel v. Schwan's Home Serv., Inc.*, No. 6:10-cv-00012, 2011 WL 573378, at *4-6 (W.D. Va. Feb. 10, 2011); *see also, e.g.*, *Greene v. Nat'l Head Start Ass'n, Inc.*, No. 1:09cv546, 2010 WL 1779677 at *5 (E.D. Va. Apr. 30, 2010); *see* Va. Code § 40.1-29.

Similarly, Zeta's decision not to pay Plaintiff any commissions during the ULOA Period did not breach the 2021 Plan or violate the VWPA. The 2021 Plan clearly required Plaintiff to be in "good standing" on the payment date in order to receive commissions. The Plan defines "good standing" as Plaintiff not being subject to any disciplinary proceedings or performance management. (Stoler Decl. Ex. 54). The record shows that Plaintiff was not in good standing beginning on July 7, 2021 because, among other reasons: (i) Mr. Martella intended and had attempted to place her on a PIP; (ii) she was in violation of Zeta's PTO Policy; and (iii) she refused to report to work or have any contact with her supervisors. (SUF ¶¶ 92, 99-102; Lang 30(b)(6) 22-25; Stoler Decl. Ex. 71). In addition, Plaintiff admits that by signing the 2021 Plan, she agreed that Zeta retained the right to interpret the plan's terms and that its decision with respect to any

disagreement between the parties regarding the 2021 Plan would be "final and binding." (Stoler Decl. Ex. 54). Accordingly, Plaintiff was not entitled to receive any commissions after July 7, 2021. *See Cauvel*, 2011 WL 573378 at *4-6; *see also* Va. Code § 40.1-29.[17]

## III.   PLAINTIFF'S GENDER DISCRIMINATION CLAIMS MUST BE DISMISSED

Plaintiff next claims that Zeta discriminated against her on the basis of her gender in violation of Title VII by: (i) paying her less than Mr. Miller; (ii) reducing her Verizon commissions and assigning the Verizon account to Mr. Miller; and (iii) subjecting her to a hostile work environment ("HWE"). (Am. Compl. ¶¶ 197-204). For the reasons set forth below, each of these claims fail as a matter of law.[18]

### A.   Plaintiff's Discrimination Claims Based Upon Mr. Miller's Compensation Are Meritless

Plaintiff's claim that Zeta discriminated against her by paying Mr. Miller a higher salary[19] and commission percentage fails at the *prima facie* stage because, at a minimum, Mr. Miller is not similarly situated to Plaintiff. For purposes of a Title VII pay discrimination claim, a comparator must be "similarly situated in all relevant respects." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010).[20] "For this inquiry, courts consider: whether the employees had the same job

---

[17] Plaintiff's unjust enrichment claims must also be dismissed because they arise out of the same conduct giving rise to her breach of contract claims, and the parties do not dispute the existence of valid contracts between them. *Middle E. Broad. Networks, Inc. v. MBI Global, LLC*, No. 1:14-cv-01207, 2015 WL 4571178, at *6 (E.D. Va. July 28, 2015).

[18] Title VII gender discrimination claims follow a burden-shifting framework in which the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Moore v. Penfed Title, LLC*, No. 1:20-cv-0867, 2021 WL 2004785, at *3 (E.D. Va. May 18, 2021). To establish a *prima facie* case of discrimination, the plaintiff must show: (i) membership in a protected class; (ii) that she was performing at a level that met her employer's legitimate expectations; (iii) an adverse employment action; and (iii) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Bart-Williams v. Exxon Mobil Corp.*, No. 1:16-cv-1338, 2017 WL 4401463, at *8 (E.D. Va. Sept. 28, 2017). If the plaintiff establishes this *prima facie* case, then the employer need only "articulate some legitimate, non-discriminatory reason for [its] action." *Bolling v. Va. Dep't of Health*, No. 3:12cv593, 2013 WL 12101106, at *5 (E.D. Va. Sept. 3, 2013). The burden then shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Crawford v. Newport News Indus. Corp.*, No. 4:14cv130, 2018 WL 2943445, at *11 (E.D. Va. June 11, 2018).

[19] Notably, Mr. Miller's salary was $50,000 *less* than Plaintiff's at the time she was hired. (Gerber Decl. ¶¶ 5, 8).

[20] To establish a *prima facie* pay discrimination claim under Title VII, the plaintiff must show (i) membership in a protected class; (ii) satisfactory job performance; (iii) adverse employment action with respect to compensation; and (iv) that similarly-situated employees outside the protected class received more favorable treatment. *Moore v. Penfed Title, LLC*, No. 1:20-cv-0867, 2021 WL 2004785, at *3 (E.D. Va. May 18, 2021).

description and were subject to the same standards; whether they had comparable experience, education, qualifications, and performance; and whether they had the same supervisors." *Chapman v. Wal-Mart, Inc.*, No. 5:20cv00105, 2021 WL 2379810, at *5 (W.D. Va. June 10, 2021). Here, Plaintiff cannot dispute that: (i) she and Mr. Miller had different job titles and responsibilities – unlike Plaintiff, Mr. Miller had a unique hybrid role making him responsible not just for bringing in new business, but also for managing and expanding Zeta's business with a subset of existing clients; and (ii) Plaintiff and Mr. Miller reported to different supervisors. (SUF ¶¶ 8-10, 54). As a result, Mr. Miller is not similarly situated to Plaintiff. *Chapman*, 2021 WL 2379810 ("Generalized similarity is not enough to survive a motion for summary judgment"); *Bolling*, 2013 WL 12101106 at *4-5; *Babus v. M/A-COM Private Radio Sys., Inc.*, No. 6:06cv00048, 2007 WL 2288021 at *5-6 (W.D. Va. Aug. 7, 2007).

Even if Plaintiff could establish a *prima facie* case of discrimination related to Mr. Miller's compensation (and she cannot), Zeta has articulated legitimate, non-discriminatory reasons for Mr. Miller's base salary and compensation structure. More specifically, Mr. Miller's salary and commission percentage were set to properly compensate him for his: (i) unique hybrid role; (ii) longer tenure of employment at Zeta; and (iii) unparalleled track record of success at Zeta – a track record that Plaintiff did not have. (Gerber Decl. ¶¶ 6-8, 10; Racklin 530-31; Gerber 89-93). In fact, Plaintiff admits that Mr. Miller generated more revenue than her in every quarter of her employment at Zeta. (Racklin 531); *see Moore*, 2021 WL 2004785 at *3-5.

Finally, there is nothing in the record to show that Zeta's articulated legitimate, non-discriminatory reasons are a pretext for discrimination. Significantly, Plaintiff admits that the only basis for her belief that Zeta's compensation decisions were discriminatory is the fact that Mr. Miller is a man and she is a woman. (Racklin 533-34, 541-42, 791-92). Such conclusory allegations are insufficient to establish pretext. *See Thorpe v. Mechanicsville Concrete, LLC*, No. 3:10-cv-

797, 2012 WL 1028592, at *5 (E.D. Va. Mar. 26, 2012); *Babus*, 2007 WL 2288021 at *6; *Williams v. Harvey*, No. 4:05CV161, 2006 WL 2456406, at *13 (E.D. Va. Aug. 21, 2006).[21]

## B. Plaintiff's Claims Regarding Verizon Are Untimely And False

Plaintiff next claims that Zeta discriminated against her by changing the calculation of her Verizon commissions and assigning the Verizon account to Mr. Miller. These claims are time-barred. Title VII claims are subject to a 300-day statute of limitations. *Smith v. Strayer Univ. Corp.*, 79 F. Supp. 3d 591, 598 (E.D. Va. 2015).[22] Plaintiff filed her Charge with the EEOC on October 26, 2021, rendering any claims that accrued prior to December 30, 2020 untimely. (SUF ¶ 103). Plaintiff admits that she knew that: (i) Zeta first changed her Verizon commission rate by June 25, 2019 when she signed the 2019 Amendment; (ii) Zeta again changed such commission rate by April 23, 2020 when she signed the 2020 Plan; and (iii) Zeta assigned the Verizon account to Mr. Miller by July 2019. (SUF ¶ 46, Racklin 275, 292). Accordingly, Plaintiff's claims are time-barred because Plaintiff admits that she became aware of these actions more than 300 days before she filed her Charge. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219-20 (4th Cir. 2007).

Even if these claims are timely, which they are not, Plaintiff's claim fails at the *prima facie* stage because, at a minimum, she cannot establish that Zeta changed the calculation of her Verizon commissions under circumstances giving rise to an inference of discrimination. The record lacks a scintilla of evidence that Mr. Gerber, the decisionmaker with respect to the amount of Plaintiff's Verizon commissions, ever made a single gender-based comment or engaged in any other conduct indicative of discriminatory animus. *See Bart-Williams*, 2017 WL 4401463, at *11. Indeed, Mr.

---

[21] Plaintiff also claims that Zeta paid her less than her male colleagues by (i) paying Mr. Zaner a 6% commission rate; (ii) granting Messrs. Brooke and Mistretta more RSUs than her at hire; and (iii) paying Messrs. Winnard, Zaner, and Walters NLBs. (Racklin 505-08). These claims fail because: (i) Mr. Zaner never earned a 6% commission rate (Stoler Decl. Exs. 35, 42); (ii) Messrs. Brooke and Mistretta were granted fewer RSUs than Plaintiff (SUF ¶ 79); and (iii) Messrs. Winnard, Zaner and Walters were never contractually entitled to or paid a NLB. (SUF ¶¶ 60-61).

[22] Any Title VII claim premised on Mr. Miller's compensation pre-dating December 30, 2020 is similarly time-barred.

Gerber repeatedly made decisions that *benefitted* Plaintiff, including deviating from Zeta's policies to allow her to receive Verizon commissions to which she was not otherwise entitled because she was no longer assigned to this account and retaining her (over male salespersons) in the March 2020 reduction in force. *See Jain v. The Cnty. Bd. of Arlington Cnty.*, No. 1:19-cv-560, 2020 WL 5793426, at *5 (E.D. Va. Sept. 28, 2020).[23]

Zeta has also articulated legitimate, non-discriminatory reasons for the decisions about which Plaintiff complains. Plaintiff admits that she was ineligible for any Verizon commissions under the 2019 Plan once VF was collapsed into VW and because she never closed a deal with VF by that time. (SUF ¶¶ 38-42). Plaintiff further admits that Zeta, nevertheless, made her eligible for Verizon commissions at a rate of 3% over the account's run rate by virtue of the 2019 Amendment. (SUF ¶¶ 46-47). The record further shows that, under the 2020 Plan, Zeta allowed Plaintiff to continue receiving Verizon commissions at 1.5% of all account revenue (not just revenue above the run rate), even though she continued to perform no work on that account. (SUF ¶¶ 55, 57). This commission calculation was similar to the 3% (over run rate) calculation used in the 2019 Amendment. (SUF ¶ 56). Moreover, these changes in the 2020 Plan were necessary because the VW Deal's final terms were materially different than what had been originally anticipated and rendered the run rate concept difficult to apply. (*Id.*).

The record also shows that Mr. Gerber assigned the Verizon account to Mr. Miller because: (i) Verizon collapsed VF into its VW business unit in 2019 and assigned his Verizon contact – Mr. Edwards – to lead such unit; (ii) Mr. Edwards was going to be the decisionmaker with respect to Zeta's future negotiations with Verizon on the VW Deal; and (iii) Verizon then informed Zeta that

---

[23] Plaintiff also appears to allege that Mr. Gerber discriminated against her by assigning the Verizon account to Mr. Miller. (Am. Compl. ¶¶ 32, 36). Plaintiff cannot establish a *prima facie* case with respect to this claim because, as set forth *supra*, she and Mr. Miller were not similarly situated and the record is devoid of any evidence of discriminatory animus on Mr. Gerber's behalf.

it only wanted to deal with one Zeta sales team moving forward – which was Mr. Miller's team by default because VW was already his account. Accordingly, Zeta has clearly articulated legitimate, non-discriminatory reasons for its decisions regarding Plaintiff's Verizon commissions and its assignment of the Verizon account to Mr. Miller. *See*, *e.g.*, *Zimmerman v. Vectronix, Inc.*, No. 1:17-cv-00299, 2017 WL 6459680, at *3 (E.D. Va. Dec. 15, 2017).

Plaintiff also cannot show pretext. Once again, when asked why she believed that the assignment of the Verizon account to Mr. Miller was motivated by discriminatory animus, Plaintiff simply speculated that "it was obvious to me that being a woman, [Mr. Gerber] did not want me running that account. . . obvious in the fact that the account was taken from me and given to a man." (Racklin 547-49; *see also* Racklin 542, 791-92). This rank speculation is woefully insufficient to establish pretext. *Thorpe*, 2012 1028592 at *5; *Babus*, 2007 WL 2288021 at *6; *Williams*, 2006 WL 2456406 at *13.[24]

## C.   Zeta Did Not Subject Plaintiff To A Hostile Work Environment

Plaintiff also claims that Zeta discriminated against her based on her gender by subjecting her to a hostile work environment ("HWE").[25]   Specifically, Plaintiff alleges that Messrs. Martella and McCarthy subjected her to a HWE beginning in July 2020 during weekly sales pipeline calls ("SPCs") that were held over Zoom by belittling her, demeaning her, making a negative example

---

[24] Plaintiff also tries to support her discrimination claims by vaguely complaining that Messrs. Martella and McCarthy did not select her to present at account reviews, gave her male coworkers "leads and referrals" and had one-on-one meetings with Plaintiff's male coworkers, but not with her.  Even if these allegations are true (which they are not), none of them constitute an adverse employment action. *Peary v. Goss*, 365 F. Supp. 2d 713, 722 (E.D. Va. 2005). (stating that "not every aspect of an employee's daily work experience constitutes a 'term, condition or benefit' of employment that can give rise to a federal cause of action . . ."); *Bart-Williams*, 2017 WL 4401463 at *9.  Moreover, Plaintiff cannot point to any evidence in the record to suggest that Messrs. Martella and McCarthy treated her differently because of her gender.  Instead, Plaintiff merely speculates "I know it's because I'm a woman." (Racklin 573-74; *see also* Racklin 553-57, 621-22, 665-68, 791-92). This is insufficient to support her claims. *Thorpe*, 2012 1028592, at *5; *Williams*, 2006 WL 2456406 at *13.

[25] In order to establish an HWE claim a plaintiff must show that: (i) she experienced conduct that was unwelcome; (ii) the conduct was based on her gender; (iii) the conduct was "sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere" and (4) "there is some basis for imposing liability on the employer." *Cox v. Rumsfeld*, 369 F. Supp. 2d 748, 757 (E.D. Va. 2005).

of her, failing to recognize her accomplishments, speaking to her in a condescending tone, and criticizing her sales activities. (Am. Compl. ¶ 198; *see* Racklin 554-67, 573-74, 605-08, 647-49). Even if true, none of these allegations are sufficient to satisfy the second and third prongs of Plaintiff's HWE claim.

Plaintiff cannot satisfy the second prong of her HWE claim because she cannot show that Messrs. Martella and McCarthy's alleged treatment of her was based on her gender. To establish this element, a plaintiff bears the burden of showing that "but for [her] gender, [she] would not have been the victim of discrimination." *Nathan v. Takeda Pharm.*, 890 F. Supp. 2d 629, 641 (E.D. Va. 2012). "Simply not getting along with others and 'personality conflicts' are not enough," and "[f]inding causation is particularly challenging where most of the comments and behavior of which [a plaintiff] complains [were] not about sex." *Id.* (internal quotation marks and citations omitted). There is no evidence in the record to show that Messrs. Martella and McCarthy treated her differently because of her gender. Indeed, Plaintiff admits that, to the extent Messrs. Martella and McCarthy treated her differently, it could have been due to a number of reasons unrelated to her gender such as the fact that: (i) she had not worked with either of them at their prior companies; (ii) she was associated with Mr. Steele's prior sales regime; or (iii) they simply disliked her demeanor. (Racklin 555, 582, 589-91; Welsh Decl. ¶¶ 9, 41-43). These admissions are fatal to Plaintiff's HWE claim. *See Nyimpha v. Ross*, No. 1:19-cv-258, 2020 WL 819839, at *7-10 (E.D. Va. Feb. 19, 2020); *Nathan*, 808 F. Supp. 2d at 641-43; *see also Valerino v. Holder*, No. 1:11-cv-1124, 2013 WL 12432290, at *8-10 (E.D. Va. Feb. 20, 2013). Plaintiff's attempt to satisfy the second element of her claim is also belied by her admission that men on her team had similar complaints about how Messrs. Martella and McCarthy treated them and the fact that Mr. Welsh resigned because of similar issues he had with Mr. Martella's abrasive style and differing sales strategies. (Racklin 580-609; Stoler Decl. Exs 59-62; Welsh Decl. ¶¶ 40-51); *Acosta v. Hilton*

*Grand Vacations Co. LLC*, No. 4:15-cv-00495, 2017 WL 1173583, at *5-6 (D.S.C. Mar. 30, 2017); *Cox*, 369 F. Supp. 2d at 757-58; *Peary*, 365 F. Supp. 2d at 727-28 (E.D. Va. 2005).

Plaintiff cannot establish the third element of her HWE claim because the examples upon which she relies simply do not rise to the level of severe and pervasive conduct.[26] (Racklin 553-69, 651-52, 731-32, 735-38). *Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219-20 (4th Cir. 2013); *Nyimpha*, 2020 WL 819839 at *6, 9-10; *Dawkins v. SBV, LLC*, No. 1:14CV711, 2016 WL 817371, at *7 n.10 (M.D.N.C. Feb. 26, 2016) ("A rude tone is not so severe and pervasive as to create a hostile work environment"); *Diamond v. Bon Secours Hosp.*, No. WDQ-07-2901, 2009 WL 9055129, at *1, *4 (D. Md. Apr. 14, 2009). Plaintiff's admission that she turned down multiple job opportunities while she was allegedly subjected to a HWE under Mr. Martella's management because she wanted to remain at Zeta also belies her HWE claim. (SUF ¶ 87); *see, e.g.*, *Spruill v. Kip Killmon's Tysons Ford, Inc.*, No. 1:12-cv-806, 2012 4829339, at *4 (E.D. Va. Oct. 10, 2012).[27]

## IV.  PLAINTIFF'S RETALIATION CLAIMS MUST BE DISMISSED[28]

Plaintiff first alleges that Zeta retaliated against her for sending the Demand Letter by: (i) placing her on unpaid administrative leave on July 29, 2020 and not paying her commissions after such date; and (ii) constructively discharging her on January 21, 2022. (Am. Compl. ¶ 214).  Each of these claims are without merit.

---

[26] Plaintiff alleges that Mr. McCarthy told her during an SPC that her Charter deal was "all luck," and that Plaintiff did not like Messrs. Martella and McCarthy's "body language," "demeanor," and "tone of voice" during the SPCs. (Racklin 553-67, 651-52, 735-38).

[27] During her second deposition, Plaintiff alleged for the first time in this case that Mr. McCarthy once told her in an undated private conversation that "women are typically weak in math." (Racklin 569-73). This is the only gender-related comment that Plaintiff has ever attributed to anyone in the entirety of this action. Even if Mr. McCarthy made this comment (which he did not), it is well-settled that "off-hand comments and isolated incidents" will not suffice to establish a hostile work environment. *See Davis v. Comcast Corp.*, No. 1:13-cv-01513, 2015 WL1111066, at *6 (E.D. Va. Jan. 26, 2015) ("Hostile work environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct[.]"); *Addison v. CMH Homes*, 47 F. Supp. 3d 404, 425-26 (D.S.C. 2014).

[28] Title VII retaliation claims are also analyzed using the *McDonnell Douglas* burden-shifting framework. *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 840 (E.D. Va. 2016). To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show: (i) that she engaged in a protected activity; (ii) that her employer took an adverse employment action against her; and (iii) that there was a causal link between the two events. *Nathan*, 890 F. Supp. 2d at 644.

Plaintiff's claim that Zeta retaliated against her by placing her on unpaid administrative leave fails at the *prima facie* stage because Plaintiff cannot establish a causal connection between the Demand letter and being placed such leave.  It is undisputed that between the date Zeta received the Demand Letter and the date Plaintiff was placed on unpaid administrative leave, Plaintiff had: (i) commenced unapproved and indefinite PTO in violation of Zeta's policies; (ii) made it clear she had no intention of returning to work, particularly if she had to continue reporting to Messrs. Martella and McCarthy; and (iii) refused to communicate with her supervisors at all. (SUF ¶¶ 92, 99-102).  Intervening events such as these show that there was no causal connection between the Demand Letter and Plaintiff's placement on leave. *See Feldman v. Law Enforcement Assoc. Corp.*, 752 F.3d 339, 349-50 (4th Cir. 2014); *Daniels v. Rumsfeld*, No. Civ. A 4:03CV60, 2004 WL 3436072, at *7 (E.D. Va. 2004).

Plaintiff also cannot establish a causal connection between the Demand Letter and Zeta's decision not to pay Plaintiff commissions during the ULOA Period. Pursuant to the 2021 Plan, Plaintiff was ineligible to receive commissions if she was not in good standing – which included being subjected to performance management. (Stoler Decl. Ex. 54).  The record indisputably shows that Mr. Martella drafted an initial PIP for Plaintiff in April 2020 and planned to give her a formal PIP *two days before* Zeta received the Demand Letter. (Lang 30(b)(6) 26-27; Martella 241-42; Gerber 155-57; Stoler Decl. Exs. 64, 69). A plaintiff cannot establish a causal connection where, as here, the adverse employment action about which the plaintiff complains took place before the Plaintiff engaged in protected activity. *Buchhagen v. ICF Int'l, Inc.*, 650 F. App'x 824, 830 (4th Cir. 2016) (no causal connection between where "the decision to place [Plaintiff] on a PIP predate her protected activity"); *Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006).[29]

---

[29] Plaintiff's attempt to shield herself from the consequences of her poor performance by failing to attend the July 7 meeting and, instead, sending the Demand Letter also fails to create an inference of retaliation. *See Robinson v. Loudoun Cnty. Pub. Sch.*, No. 1:16-cv-1604, 2018 WL 1277736, at *4 (E.D. Va. Mar. 9, 2018); *see also Giudice v.*

Even if Plaintiff could establish a *prima facie* case of retaliation, Zeta has articulated legitimate, non-retaliatory reasons for placing her on an unpaid leave of absence and not paying her commissions – namely: (i) Plaintiff was subject to performance management thereby rendering her ineligible for commissions; (ii) Plaintiff was in violation of the Company's PTO policy, this allowing it to discontinue her PTO; and (iii) Plaintiff had made it clear she had no intention to return to work or otherwise perform her job duties. (SUF ¶¶ 89, 92-93, 99-102). The record is also devoid of any showing that retaliatory animus was the "but-for cause" of the conduct about which Plaintiff complains and Plaintiff's speculation that Zeta was motivated by retaliatory animus is insufficient to support her claim.[30] *Ferguson v. Holder*, No. 1:14-cv-1641, 2015 WL 11117148, at *9 (E.D. Va. Feb. 9, 2015); *accord Lewis v. Gibson*, 621 F. App'x 163, 165-66 (4th Cir. 2015); *Daniels*, 2004 WL 3436072 at *7-9.[31]

Plaintiff next claims that Zeta retaliated against her for sending the Demand Letter by constructively discharging her. Plaintiff cannot show that she was constructively discharged.[32]

Plaintiff cannot satisfy the first element of her constructive discharge claim because she cannot show that Zeta placed her on unpaid administrative leave with the "specific intent to force [her] to leave." *McKinley*, 192 F. Supp. 3d at 684. As detailed above, Zeta placed Plaintiff on unpaid administrative leave for legitimate, non-retaliatory reasons – namely, Plaintiff's violation

---

*Red Robin Int'l, Inc.*, 555 F. App'x 67, 69 (2d Cir. 2014); *Boatright v. U.S. Bancorp*, No. 18-cv-7293, 2020 WL 7388661, at *20-21 (S.D.N.Y. Dec. 16, 2020).

[30] Retaliation claims have a "heightened causation standard," and "an adverse employment action is only actionable as retaliation if retaliatory animus was the 'but for' cause of the action." *Tomasello v. Fairfax Cnty.*, No. 1:15-cv-95, 2016 WL 165708, at *16 (E.D. Va. Jan. 13, 2016).

[31] To the extent that Plaintiff attempts to establish her retaliation claim by pointing to the temporal proximity between the Demand Letter and her placement on unpaid administrative leave, such fact alone fails to establish retaliation. *Daniels*, 2004 WL 3436072 at *7-9.

[32] In order to establish a claim of constructive discharge, Plaintiff must be able to show: (1) the deliberateness of an employer's actions, motivated by unlawful bias; and (2) the objective intolerability of the employment conditions." *McKinley v. Salvation Army*, 192 F. Supp. 3d 678, 684 (W.D. Va. 2016). The Fourth Circuit "has insisted that constructive discharge claims be carefully cabined because the claim is so open to abuse." *Lauture v. Saint Agnes Hosp.*, 429 F. App'x 300, 308 (4th Cir. 2011).

of Zeta's PTO policy and refusal to return to work – and the record is devoid of any evidence that Zeta's true motive in doing so was to force Plaintiff to resign. *See, e.g., Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 425 (4th Cir. 2014); *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 945 (4th Cir. 1992).

Plaintiff also cannot satisfy the second element of her constructive discharge claim because the record is devoid of any evidence that her working conditions were "intolerable" at the time she resigned. As an initial matter, Plaintiff admits that by the time she resigned from her employment, she had not been to work at Zeta or spoken to her alleged harassers Messrs. McCarthy or Martella in *six months. Freeman*, 750 F.3d at 425 (affirming summary judgment on constructive discharge claim where, at the time the plaintiff resigned, she had been on leave without any contact with her harasser for months); *New v. Thermo Fisher Sci., Inc.*, No. 1:19cv807, 2022 WL 787954, at *26 (M.D.N.C. Mar. 15, 2022). Plaintiff also admits that she turned down multiple job offers and transfer opportunities during her employment because she wanted to remain at Zeta and under Mr. Martella's supervision. *See New*, 2022 WL 787954 at *26. Finally, courts have routinely dismissed constructive discharge claims where, as set forth *supra*, Plaintiff has failed to establish that she was subjected to a HWE. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019).[33]

## CONCLUSION

Defendant respectfully requests that Zeta's Motion be granted in its entirety and that this Court award Zeta such other and further relief as this Court deems just and proper.

Dated: Washington, D.C.                       */s/ Paul Werner*
     June 24, 2022                              Paul Werner

---

[33] Plaintiff's claim that Mr. Martella retaliated against her for filing the December 2020 Complaint by allegedly mistreating her during the SPCs and fabricating her performance issues is equally meritless for at least two reasons. (Am. Compl. ¶¶ 97, 100, 214). First, the record clearly shows that Mr. Martella began raising concerns regarding Plaintiff's performance long before she made the December 2020 Complaint. (SUF ¶¶ 64-66); *see Nnadozie v. Gensis HealthCare Corp.*, 730 F. App'x 151, 160 (4th Cir. 2018). Second, it is undisputed that Mr. Martella was unaware that Plaintiff had made the December 2020 complaint when he conducted the SPCs or addressed any of Plaintiff's performance issues. (Martella 203; Racklin 704-05, 724-25); *Causey v. Balog*, 162 F.3d 795, 803-04 (4th Cir. 1998). Accordingly, Plaintiff cannot establish this portion of her retaliation claim either.