IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MELISSA RACKLIN,                    )
                                    )
            Plaintiff,              )
      v.                            )
                                    )        Case No. 1:21-cv-1035 (AJT/JFA)
ZETA GLOBAL CORP.,                  )
                                    )
            Defendant.              )
_____)

## MEMORANDUM OPINION & ORDER

In this employment dispute, Defendant Zeta Global Corp. ("Zeta") has filed a Motion for Summary Judgment [Doc. No. 135] as to all of Plaintiff Melissa Racklin's claims, which include Fraud in the Inducement (Count I); Breach of Contract/Unjust Enrichment relating to Verizon commission payments (Counts II-III); Breach of Contract/Unjust Enrichment and Virginia Wage Payment Act relating to Racklin's placement on unpaid administrative leave, beginning July 29, 2021, and Zeta's decision not to pay Racklin her commissions or salary (Counts IV-VII); Discrimination and Hostile Work Environment in violation of Title VII (Count VIII); and Retaliation and Constructive Discharge in violation of Title VII (Count IX) ("the Motion").[1] For the reasons stated below, the Motion is **GRANTED** as to all Counts and this case is **DISMISSED**.[2]

---

[1] Also pending is Zeta's Motion *in Limine* to Exclude the Expert Report and Testimony of Michael J. Kresslein [Doc. No. 143], which the Court will **DENY** as moot.

[2] Racklin has filed a Motion to Strike Reply Declaration of Jonathan Stoler, Esq. [Doc. No. 155] on the grounds that it constitutes an improper extension of Zeta's Reply Brief. The Court has reviewed the Declaration against the Reply and finds that overall, it reflects generally the positions and arguments in the Rely and does not constitute a material extension of it. *See Tafas v. Dudas*, 511 F. Supp. 2d 652, 662 (E.D. Va. 2007) (denying motion to exclude attorney declaration on Local Rule 7(F) grounds where the declaration, though it "include[d] some legal conclusions," did not put forward any "significant arguments" that were "not also found in the brief itself" and was included as "an exhibit" to the party's brief). Accordingly, the Court will **DENY** Racklin's Motion to Strike.

# I.   BACKGROUND[3]

The following facts are undisputed unless otherwise noted.

Zeta Global Corporation is a digital marketing and marketing technology company. [Doc. No. 137] (Defendant's Statement of Undisputed Facts (hereinafter "SUF")), ¶ 1. Zeta employed Melissa Racklin as Vice President, Enterprise Sales from November 12, 2018 until January 21, 2022, when she resigned to begin a new job. [SUF], ¶¶ 2, 100. Racklin's main responsibility at Zeta was to sell the company's proprietary ZX product, which provides digital media solutions to assist companies in acquiring new customers. [SUF], ¶ 3.

Zeta hired Donald Steele in March 2017 to serve as the company's first ever Chief Revenue Officer ("CRO"). [SUF], ¶ 4. Sometime thereafter in 2017, Zeta, through the efforts of Donald Steele, began recruiting Racklin to join Zeta. [SUF], ¶ 11; [Stoler Decl.], Ex. 1 (Racklin Dep. Tr.) at 490:13-491:18.[4] At that time, she was employed at Epsilon Data Management, LLC ("Epsilon"); and  Steele had known Racklin since 2011 when he hired her to work at Epsilon. [SUF], ¶ 12; [Stoler Decl.], Ex. 1 (Racklin Dep. Tr.) at 91:8-11, 94:3-10.

On October 10, 2018, Racklin interviewed for a position at Zeta with several people, including Steele and the company's Chief Operating Officer, Steven Gerber. [SUF], ¶ 13. During those interviews, according to Racklin, Gerber and Steele promised Racklin that she would be assigned and/or lead the T-Mobile, Sprint, and Verizon client accounts if she joined Zeta. [SUF], ¶¶ 14-15; [Doc. No. 149] (Plaintiff's Response to Zeta's Statement of Undisputed Facts

---

[3] In its reply brief, Zeta argues that because Racklin failed to respond to 52 of Zeta's SUFs and her responses to 49 of the remaining 51 SUFs are deficient and in violation of Local Rule 56(B), "Plaintiff must be deemed to have admitted at least 101 out of the 103 statements" in Zeta's Statement of Undisputed Material Facts. [Doc. No. 151], at 2. While Racklin's Response to the Statement of Facts fails to comply in all respects with the local rules, the Court can sufficiently determine which facts are actually in dispute and therefore declines to deem admitted Zeta's SUFs.

[4] Among other Declarations, Zeta filed the Declaration of Jonathan Stoler, Esq. in Support of Defendant's Motion for Summary Judgment. [Doc. No. 138] (hereinafter "Stoler Decl."), the Declaration of Brian Fong in Support of Defendant's Motion for Summary Judgment [Doc. No. 139] (hereinafter "Fong Decl."), and the Declaration of Sean Welsh in Support of Defendant's Motion for Summary Judgment [Doc. No. 142] (hereinafter "Welsh Decl.").

(hereinafter "RSUF")), ¶ 14. Gerber and Steele deny making those promises. [SUF], ¶ 16. Racklin does not claim that any other Zeta employees made any statements and/or promises to her regarding the Verizon, Sprint, or T-Mobile accounts during her recruitment, [SUF], ¶ 17; and, besides Racklin's recollections, the record does not contain any other evidence that Steele and Gerber made such promises to Racklin. [SUF], ¶ 18; [RSUF], ¶ 18.

At the time Gerber and Steele made the alleged promises, the promised accounts were assigned to Chad Miller, who at all relevant times, served as Senior Vice President, Brand Development, [SUF], ¶ 6; and during her recruitment process, Racklin learned that Sprint and Verizon's mobile phone division, Verizon Wireless ("VW"), were already assigned to Miller. [SUF], ¶ 21; [RSUF], ¶ 21. Zeta considered Miller a very successful salesperson and one of Zeta's most important employees. [SUF], ¶ 6. By way of example, upon assuming the CRO position at Zeta, Steele terminated every member of the Enterprise Sales team—the internal group exclusively responsible for bringing in new clients, oftentimes referred to as "new logos"—except Chad Miller. [SUF], ¶¶ 4-5.

On October 12, 2018, Zeta sent Racklin an offer letter for the position of Vice President, Enterprise Sales. [SUF], ¶ 22. Racklin understood that she would be responsible for bringing in new logos for Zeta. [SUF], ¶ 22. The offer letter did not identify specific clients or accounts that Racklin would lead or work on. [SUF], ¶ 23. Racklin carefully and completely reviewed the offer letter and understood its terms before signing the letter on October 16, 2018, thereby accepting Zeta's offer of employment. [SUF], ¶ 24. The offer letter did not mention the assignment of any particular accounts to her and by signing the offer letter, Racklin agreed to "comply with and be bound by the operating policies, procedures and practices of the Company." [SUF], ¶¶ 23, 25. The offer letter also stated that "[t]his offer letter sets forth the entire agreement and understanding

3

between the Company and you relating to your offer of employment and supersedes all prior verbal discussions between us." [SUF], ¶ 25.

During Racklin's employment at Zeta, she was paid a base salary and could earn commissions on any deal with any client she brought to Zeta and the amount of commissions she could earn each month was unlimited. [SUF], ¶ 33. Racklin, like other Zeta salespeople, received a new commission plan every calendar year. [SUF], ¶ 29. Racklin signed her first commission plan on March 10, 2019 (the "2019 Plan"), [SUF], ¶ 30. Under the 2019 Plan, Racklin would be eligible to receive commissions in the amount of 5% of Gross Recognized Revenue ("GRR") on ZX deals she brought to Zeta. [SUF], ¶ 32. Zeta reserved the right to modify the 2019 Plan as well as interpret the plan's terms. [SUF], ¶ 31.

### A.  Racklin's Verizon Fios Prospects and 2019 Plan Amendment

On February 7, 2019, Racklin notified Gerber, Steele, and her direct manager at the time, Sean Welsh, that her contact at Verizon Fios ("VF"), Anne Hogan, was interested in doing business with Zeta. [SUF], ¶ 36. Racklin insisted that the VF opportunity was distinct from the work Chad Miller was performing for Verizon Wireless through his Verizon contact, John Edwards. [SUF], ¶ 36. Gerber authorized Racklin to pursue a "pilot" (short-term initial test contract) with VF. [SUF], ¶ 37; [RSUF], ¶ 37.

In mid-May 2019, Verizon restructured and collapsed VF into its existing VW business unit. [SUF], ¶ 38. Verizon told Zeta that it wished to negotiate and deal with only one Zeta team going forward. [SUF], ¶ 39; [RSUF], ¶ 39. As a result of this internal restructuring, Verizon assigned John Edwards—Miller's Verizon contact—to manage Verizon's overall Zeta relationship, [SUF], ¶ 39; [RSUF], ¶ 39; and Gerber decided Miller would be exclusively responsible for the VW account. [SUF], ¶ 40; [RSUF], ¶ 39. In or around July 2019, John Edwards

informed Zeta that Verizon would not move forward with the VF pilot that Racklin had been pursuing;[5] and Racklin had no further contact with Verizon after July 2019. [SUF], ¶¶ 41-42.

Pursuant to the 2019 Plan, Racklin was not entitled to earn commissions on any Verizon deals that she did not bring to Zeta. [SUF], ¶ 43. Gerber offered to amend Racklin's 2019 Plan to make her eligible for commissions amounting to 3% of the GRR over the "run rate"[6] on ZX deals that any Zeta sales representative closed with Verizon "for a period of up to three years" (the "2019 Amendment"). [SUF], ¶ 44. This compensation structure was "highly unusual" and a departure from Zeta's compensation policy and standard practice. [SUF], ¶ 45. Racklin signed the 2019 Amendment on June 25, 2019, and returned a copy to Zeta on July 1, 2019. [SUF], ¶ 46. As discussed below, Racklin disputes the validity of the 2019 Amendment, stating that she "repeatedly and adamantly objected to Zeta's decision to remove her from the Verizon account and reduce her Verizon commission to 3%," and only "signed the 2019 Amendment . . . under duress," pointing to her emergency room visit the day after she signed the 2019 Amendment as evidence of her duress. [RSUF], ¶ 46. In March 2020, Miller closed the Verizon deal, which was intended to run for 36 months. [SUF], ¶ 48. Absent the 2019 Amendment, Racklin would not have been entitled to commissions on any VW deal that Miller closed. [SUF], ¶ 47.

### B. March 2020 Zeta Sales Force Reorganization

In March 2020, Gerber removed Steele as CRO, dissolved the Enterprise Sales team, and terminated every Enterprise Sales team member except Racklin, Welsh, Mary Schlafly, and Jay Rogers. [SUF], ¶ 50. Gerber did not terminate Racklin in March 2020 because he still believed in Racklin's ability to generate revenue. [SUF], ¶ 53. Gerber assigned Welsh, Schlafly, and Racklin

---

[5] Racklin contends that the deal that Verizon ultimately signed with Zeta in March 2020 grew out of and was very similar to the VF deal that Racklin was pursuing. [RSUF], ¶ 41.

[6] The term "run rate" was defined as the monthly average of revenues received from Verizon in the previous year. [SUF], ¶ 44 n.3.

to a new ZX sales team reporting to Matt Martella, who Zeta hired as President of ZX in January 2020. [SUF], ¶ 51. Although Miller reported to Martella for a short period of time, he was subsequently assigned to report to Tom Walsh, Zeta's head of strategic partnerships. [SUF], ¶ 54.

### C.   Racklin's 2020 Commission Plan

On April 9, 2020, Zeta presented Racklin with a copy of her proposed 2020 commission plan ("Proposed Plan"). [SUF], ¶ 55. The Proposed Plan eliminated the "run rate" concept for her Verizon commissions. [SUF], ¶ 55. Instead, the Proposed Plan made Racklin eligible for commissions on all Verizon business at a rate of 1% of the GRR collected from Verizon for 2020. [SUF], ¶ 55. Zeta sought to amend the commission calculation because the final terms of the VW deal were materially different than what had been originally anticipated, rendering the run rate difficult to apply. [SUF], ¶ 56. Nevertheless, Zeta contends, and Racklin disputes, that this commission structure was closely equivalent in value to the 3% commissions over the run rate that Racklin received under the 2019 Amendment.  [SUF], ¶ 56; [RSUF], ¶ 56.

Racklin initially refused to sign the Proposed Plan. [SUF], ¶ 57. Over the following two weeks, however, Racklin and Zeta negotiated revisions to the Proposed Plan's terms, [SUF], ¶ 57; and eventually agreed on the following terms: (i) Racklin would be eligible to earn 1.5% of Verizon GRR, which included the entirety of the VW Deal's 36 month term and (ii) Racklin's commissions on Verizon deals would be calculated based upon recognized (i.e. billed) revenue rather than revenue actually collected (the "2020 Plan"). [SUF], ¶ 57. Racklin read the 2020 Plan before she signed it and understood its terms. [SUF], ¶ 58. Racklin, however, claims she signed the 2020 Plan under duress. [RSUF], ¶¶ 57-58.

### D.  Racklin's 2020 Performance and HR Concerns

In 2020, Martella hired four new ZX salespeople: (i) Cameron Roegner, (ii) Rick Winnard, (iii) Eric Zaner, and (iv) Matthew Walters. [SUF], ¶ 59. While there is some dispute about whether Zaner, Winnard, and Walters were offered a $20,000 New Logo Bonus ("NLB") for each new logo they brought in during the 2020 calendar year, those individuals never received an NLB. [SUF], ¶¶ 60-61; [RSUF], ¶ 59. Winnard and Zaner were ineffective in their roles and Martella considered placing them on a performance improvement plan ("PIP") but they resigned before he could. [SUF], ¶ 62.

In the summer of 2020, Martella began to develop serious concerns regarding Racklin's performance. [SUF], ¶ 63. Martella expected all ZX salespersons to close 4-6 deals per year, but Racklin, as of August 2020, had only closed one deal with one client (Charter Communications). [SUF], ¶¶ 64-65. Between August and December 2020, Martella considered placing Racklin on a PIP and possibly terminating Racklin's employment if her sales numbers did not improve. [SUF], ¶ 66. Martella ultimately decided not to take any action, and instead gave Racklin additional time to improve her performance. [SUF], ¶ 66.

In December 2020, Welsh—Racklin's direct supervisor—resigned due, in large part, to Martella's management style, differing sales philosophies, and related difficulties working together. [SUF], ¶ 67.

On December 4, 2020, Racklin forwarded to Denise Lang, Zeta's acting head of Human Resources, an email she had sent to Martella and Gerber to complain about criticisms they made about her work on Comcast. [SUF], ¶ 68. During a follow-up call with Lang, Racklin complained that she was the only member of her team not selected to present during a July 2020 account

review. [SUF], ¶ 69.[7] Lang subsequently gathered information about the account review presentation process and shared that information with Racklin. [SUF], ¶ 71. Racklin later directed Lang to stop making any additional inquiries. [SUF], ¶ 71. In her email informing Lang that she did not need to take any further action, Racklin wrote: "As a female, overseeing our Human Resources, I'm sure you understand why I'm disappointed not to have the fair opportunity like my peers." [Stoler Decl.], Ex. 51 at PageID# 4525. Following Lang's inquiry into the account review process, which involved speaking with Martella, Racklin began receiving responses to weeks-old emails from Martella. [Stoler Decl.], Ex. 53; [RSUF], ¶ 72.

### E.   2021 Commission Plan

On March 29, 2021, Racklin agreed to the terms of her 2021 commission plan (the "2021 Plan"), which contained the same terms as her 2020 Plan with respect to her Verizon commissions. [SUF], ¶ 73. Racklin states that she objected to the 2021 Plan because it did not align with prior agreements. [RSUF], ¶ 73. The 2021 Plan provides that in order to receive commissions, Racklin must "[1] be employed and [2] in good standing on the date that the [commissions] are paid by Zeta Global." [Stoler Decl.], Ex. 54 at 1. Under the definition of "good standing" in the 2021 Plan, Racklin was required to "not [be] subject to any disciplinary proceedings, not [have] received any disciplinary sanctions and/or not [be] subject to performance management." [*Id.*]

### F.   2021 ZX Hirings and Martella's Interactions with Racklin

In March 2021, Zeta acquired Kinetic Data, a company owned by Kevin McCarthy. [SUF], ¶ 76. McCarthy became SVP of Business Development on the ZX team. [SUF], ¶ 77. ZX salespeople, including Racklin, reported to McCarthy. [SUF], ¶ 77.

---

[7] Racklin later clarified that she was the only person on her team with something to present who was not asked to present at the July 2020 account review. [RSUF], ¶ 70.

In the beginning part of 2021, Martella made several ZX hires, including two salespeople, Tim Brooke[8] and Michael Von Eyers. [SUF], ¶¶ 75, 80. Martella did not consider Von Eyser or Brooke to be strong sellers and considered placing both of them on a PIP. [SUF], ¶ 82. Von Eyser was placed on a PIP and resigned one week before McCarthy planned to terminate him. [SUF], ¶ 82. Brooke was similarly placed on a performance development plan. [SUF], ¶ 82.

On January 14, 2021, Racklin and Martella had a phone call. [SUF], ¶ 84; [Stoler Decl.], Ex. 63. Although there is some dispute about whether Martella discussed performance-related issues with Racklin, there is no dispute that Martella asked Racklin to at least consider "explor[ing] another role internally." [Stoler Decl.], Ex. 63 at PageID# 4583; [SUF], ¶ 84; [RSUF], ¶ 84.[9]

During her employment at Zeta, Racklin closed deals with two clients: Charter and Cox Communications. [SUF], ¶ 86. Racklin did have fruitful discussions with other clients, including Verizon and Marriot. [RSUF], ¶ 86. Nevertheless, on April 22, 2021, Martella finalized a PIP for Racklin in consultation with Zeta's HR. [SUF], ¶ 85. Martella did not deliver the PIP to Racklin at that time because of McCarthy's recent arrival. [SUF], ¶ 85.

### G.  Racklin's Demand Letter, PTO and Ultimate Resignation

In July 2021, Martella formally decided to place Racklin on a PIP, and attempted to set up a meeting with Racklin on July 7, 2021 to communicate that decision. [SUF], ¶ 89. Racklin, however, told Martella on July 6th that she could not attend a meeting on July 7th because of her daughter's surgery. [Doc. No. 149-28], Ex. 28. Martella agreed to reschedule the meeting for some time "early next week." [*Id.*]

---

[8] When hired, Brooke received 50,000 Restricted Share Units ("RSUs"). [SUF], ¶ 79. In accordance with her offer letter, Plaintiff had received 75,000 RSUs. [SUF], ¶ 79; [Stoler Decl.] Ex. 9 at ¶ 2(d).
[9] In March 2021, Racklin turned down an opportunity to join R2i, a digital marketing company, as its Chief Revenue Officer because she wanted to stay at Zeta. [SUF], ¶ 87. She also declined job opportunities with digital marketing companies Claritas and R2i in September 2020. [SUF], ¶ 87.

Three days later, on July 9, 2021, Racklin's counsel delivered a demand letter to Zeta. [SUF], ¶ 90; [Stoler Decl.], Ex. 70. The demand letter, among other things, (i) described Racklin's potential claims against Zeta, (ii) requested a settlement of $2.85 million, and (iii) requested that Martella and McCarthy have no direct communication with Racklin. The demand letter further advised Zeta that because of her treatment at Zeta, "[Racklin] can no longer continue her employment without risking further harm" and that "[her] continued employment with Zeta under the circumstances is untenable." [Stoler Decl.], Ex. 70 at 3-4. After receipt of the demand letter, Zeta retained Brian Fong of Sheppard, Mullin, Richter & Hampton LLP to investigate Racklin's claims. [SUF], ¶ 91; [Fong Decl.], ¶ 4.

On July 12, 2021, Racklin began taking paid time off ("PTO"), without explicit approval and without providing a date on which she planned to return, which violated Zeta's policies. [SUF], ¶ 92; [RSUF], ¶ 92.

On July 23, 2021, Fong wrote a letter to Racklin's counsel, stating that they had been unable to "substantiate any of Ms. Racklin's vague allegations of mistreatment" and asked Racklin's counsel to provide the "documentary evidence" referenced in Racklin's demand letter. [SUF], ¶ 94; [Doc. No. 149-37], Ex. 37. On July 28, 2021, Racklin's counsel provided the requested documents to Fong. [SUF], ¶ 95. Zeta agreed to conduct a further investigation of Racklin's claims. [SUF], ¶ 96.

Racklin remained on PTO until July 29, 2021, when Zeta's counsel, Brian Fong, notified Racklin's counsel that: "Given [that] Ms. Racklin has been on PTO since July 9, 2021 and further investigation is still warranted, Zeta is placing Ms. Racklin on unpaid administrative leave of absence effective July 29, 2021, while we interview the witnesses now identified by Ms. Racklin

regarding her claims. We will contact you separately to arrange for an interview of Ms. Racklin at the appropriate time." [Doc. No. 149-35], Ex. 35; [SUF], ¶ 93; [RSUF], ¶ 93.

On July 30, 2021, Racklin's counsel sent another letter to Fong, inquiring why Racklin had not received her June 2021 commission payment, which was scheduled to be paid on or around July 30, 2021, and asking Zeta to reverse its decision to place Racklin on unpaid administrative leave. [Doc. No. 149-33], Ex. 33 at PageID# 5284-85. On August 2 and 3, Fong discussed with Racklin's counsel why Racklin was not eligible to earn commissions, including that she was not in good standing, as defined in the 2021 Plan. [SUF], ¶ 97; [RSUF], ¶ 97; [Fong Decl.], ¶ 16; [Doc. No. 149-39], Ex. 39.

On August 13, 2021, Fong interviewed Racklin; that same day Racklin filed this lawsuit. [Doc. No. 149-33], Ex. 33 at PageID# 5208; [Doc. No. 1-2]. Following the commencement of litigation, a separate Sheppard Mullin "team became responsible" for handling the Racklin matter and communicating with her counsel. [Fong Decl.], ¶ 20.

By letter dated October 20, 2021, Racklin's counsel wrote Zeta's counsel, Jonathan Stoler of Sheppard Mullin, asking him to address several issues, including (i) the status of Fong's investigation; (2) the status of Racklin's employment with Zeta; and (3) Zeta's basis for withholding Racklin's June commissions. [Doc. No. 149-33], Ex. 33 at PageID# 5208.

On November 3, 2021, Stoler responded to the October 20th letter, in which he: (i) notified Racklin's counsel that its investigation found no basis to deviate from Fong's initial conclusion and (ii) explained that Racklin remained on unpaid administrative leave. [SUF], ¶ 98. Specifically, the letter stated, "[a]s you should be aware, Ms. Racklin has been placed on [unpaid administrative leave] because: (i) she refuses to report to work and has not been approved for additional paid time off in accordance with the Company's policies; and (ii) as described in your July 9, 2021 letter to

[Zeta], Ms. Racklin refuses to have any direct communication with her supervisors and thus could not perform her job duties even if she did report to work." [Stoler Decl.], Ex. 71. The letter also explained that "Ms. Racklin's placement on unpaid administrative leave rendered her an employee 'not in good standing' and thus rendered her ineligible to receive any additional commission payments in accordance with Company policy." [*Id.*], at 2.

On January 21, 2022, Racklin resigned from Zeta to start a new job with the digital marketing firm, Data Axel. [SUF], ¶ 100.

## II.    LEGAL PRINCIPLES

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).

The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of

*material* fact."). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

## III.    ANALYSIS

### A.   Fraud in the Inducement (Count I)

Zeta moves for summary judgment on Count I (Fraud in the Inducement) on the grounds that it is both time-barred and meritless as a matter of law. [Doc. No. 137], at 14. Racklin contends that "disputed facts" prevent the Court from disposing of Count I on summary judgment. [Doc. No. 149], at 17. Given the undisputed evidence concerning what Racklin knew, and when, concerning the assignment of the allegedly promised accounts, Racklin's Fraud in the Inducement claim is barred by the applicable statute of limitations.

The statute of limitations for fraud actions in Virginia, including Fraud in the Inducement, is two years "after the cause of action accrues." Va. Code § 8.01-243(A); *see also McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 806-07 (E.D. Va. 2017) (applying Virginia's two-year statute of limitation to fraud in the inducement claim); *Whalen v. Rutherford*, 2013 WL 3174702, at *3-4 (W.D. Va. June 21, 2013) (same). The cause of action does not accrue until such fraud is discovered "or by the exercise of due diligence reasonably should have been discovered." Va. Code § 8.01-249(1). The burden rests with the plaintiff to "prove that, despite the exercise of due diligence, [she] could not have discovered the alleged fraud except within the two-year period before [she] commenced the action." *Dunlap v. Texas Guaranteed*, 590 F. App'x 244, 244 (4th Cir. 2015) (per curiam) (quoting *Schmidt v. Household Fin. Corp.*, II, 661 S.E.2d 834, 839 (Va.

2008)). "To comply with the due diligence requirement, the plaintiff must use '[s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent [person] under the particular circumstances.'" *Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 425 (E.D. Va. 2011) (alterations in original) (quoting *STB Marketing Corp. v. Zolfaghari*, 393 S.E.2d 394, 397 (Va. 1990)).

In her Amended Complaint, Racklin alleges that Gerber and Steele "promised Ms. Racklin that if she joined Zeta, she would be given the [T-Mobile, Sprint, and Verizon] accounts . . . and would *lead all sales efforts* on Zeta's behalf." [Am. Compl. ¶ 12 (emphasis added)]; *see also* [Doc. No. 149], at 1 ("Zeta actively recruited Ms. Racklin to join Zeta by promising she would lead Zeta's relationships with her long-term clients, Verizon, Sprint, and T-Mobile."). In her deposition, Racklin testified that Gerber, as part of his recruitment pitch, told her that he "wanted to assign" her the T-Mobile, Verizon, and Sprint accounts, and that since Racklin "had long-term relationships with all of those clients, [she] would *hit the ground running*." [Doc. No. 149-6], Ex. 6 (Racklin Dep. Tr.) at 68:20-69:14, 70:11-18 (emphasis added). Racklin also testified that Gerber told her that Chad Miller "needed to be taken off the [Sprint] account" due to Miller's problems with a Sprint/T-Mobile executive. [Doc. No. 149-6], Ex. 6 (Racklin Dep. Tr.) at 72:25-73:18. And in her Declaration, Racklin attests that these promises were the primary reason for her decision to accept employment with Zeta. [Racklin Decl.], ¶ 6.

Racklin alleges in her Amended Complaint, however, that "[o]nce Ms. Racklin's employment with Zeta commenced, Mr. Gerber and Mr. Steele's promises were *quickly retracted*." [Am. Compl. ¶ 20 (emphasis added).] While there is a genuine dispute about whether Gerber and Steele promised Racklin that she would lead and/or be assigned the Sprint, T-Mobile, and Verizon accounts, the undisputed facts show that Racklin knew as of the time of her

14

recruitment that the Sprint and Verizon accounts belonged to Chad Miller, [SUF], ¶ 21, and that after officially joining Zeta, Racklin's superiors prevented her from working on T-Mobile and Sprint's accounts in December 2018 and early 2019, *see, e.g.*, [Stoler Decl.], Ex. 1 (Racklin Dep. Tr.) at 138:25-139:9 ("Q. Did you prospect [T-Mobile] in any way when you joined Zeta? A. No. . . . I was told that I had to hold off. So I was told that it was Chad Miller's account and I had to hold off before I could prospect them."); 147:21-148:7 ("[Y]ou were permitted to do some prospecting for Sprint? . . . . A. No. I attended a meeting. . . . I was never allowed to have future meetings, never had future meetings, and never got paid on anything Sprint-related."). For example, on March 19, 2019, approximately five (5) months after she accepted her VP position at Zeta, Racklin emailed her then direct supervisor, Sean Welsh, about the Sprint, T-Mobile, and Verizon Wireless accounts, acknowledging that the accounts belonged to Chad Miller and expressing a concern that she was "losing out on revenue opportunities on these accounts." [Stoler Decl.], Ex. 73 at 2.[10] Racklin also testified at her deposition that:

> These accounts were assigned to Chad Miller. And there was no intention of ever giving those accounts to me. There never was an intention. In the recruiting process, I was being told, to entice me to come over to work on T-Mobile, Sprint and Verizon . . . . So walking into Zeta, *if those were my clients, I would have that same opportunity out of the gate*. But there was never an intention. Those accounts were never going to be my accounts. *Once I got to Zeta, I realized that*.

[Stoler Decl.], Ex. 1 (Racklin Dep. Tr.) at 145:24-146:14 (emphasis added). And while Racklin was permitted to work on the separate VF Verizon account, she was removed from that account following Verizon's restructuring in May 2019, [SUF], ¶¶ 39-40,[11] and had no further involvement

---

[10] [Stoler Decl.], Ex. 1 (Racklin Dep. Tr.) at 140:19-141:9 ("Q. Did you ask Mr. Welsh why [T-Mobile had not been assigned to you]? A. Yes. Q. And what did he say? A. That it was Chad Miller's account. . . . Q. Did you ever follow up with anybody about T-Mobile? A. Multiple times. . . . Q. When did you follow up with Mr. Welsh? A. Multiple times throughout January [2019]. I sent him an e-mail . . . specifically asking about T-Mobile, Sprint and Verizon and that they were still Chad Miller's accounts and that I wasn't getting any opportunity to work them.").

[11] Of note, in requesting to prospect the VF account, Racklin took great pains to differentiate this line of potential Verizon business from Chad Miller's Verizon-related work. *See, e.g.*, [Stoler Decl.], Ex. 15 at PageID# 4333 (Racklin

with Verizon following Verizon's decision in July 2019 to not move forward with the VF pilot that Racklin had been pursuing. [SUF], ¶ 41; [Doc. No. 149-2] (Declaration of Melissa Racklin (hereinafter "Racklin Decl.")), ¶ 10.

Moreover, Racklin has failed to present a genuine issue of material fact with respect to whether the limitations period was extended because of her being misled into thinking that she would eventually be given those accounts.[12] In sum, by July 2019, at the absolute latest, Racklin knew, or should have known, that she would not receive the T-Mobile, Sprint, and Verizon accounts as Zeta purportedly promised during the recruitment process. She did not receive those accounts upon joining Zeta in late-2018, and, after months of asking to work on those accounts, Zeta continued to refuse to reassign the accounts from Miller to Racklin, even assigning away the Verizon account despite her "repeatedly and adamantly object[ing] to Zeta's decision to remove [her] from the Verizon account." [Racklin Decl.], ¶ 12. By this point, a reasonable and prudent person should have realized that Zeta would not be reassigning those accounts from Miller to Racklin, or have had "reason to discover the injury that resulted therefrom." *Fluor Fed. Sols., LLC v. BAE Sys. Ordnance Sys., Inc.*, 2020 WL 3304196, at *4 (W.D. Va. June 18, 2020). Because

---

email to Gerber and others noting "again" that VF was a "very separate company than Verizon Wireless and what work we do with John Edwards," Miller's Verizon point-of-contact]).

[12] In support of her claim that a triable issue exists concerning whether her fraud claim is time barred, Racklin references several exchanged text messages, one of which is from 2020 noting that Racklin "has an ORP for Sprint tomorrow" but also that "Sprint is owned by Chad [Miller]." [RSUF], ¶ 18; [Doc. No. 149-10], Ex. 10. Racklin contends this text exchange evidences Zeta's continuing efforts to lure her into believing that she would ultimately be assigned the promised accounts. The Court has reviewed those text messages and finds them insufficient to create a triable factual issue concerning when she knew or should have discovered the alleged fraudulent intention not to perform the alleged promises. For similar reasons, Racklin's equitable tolling arguments are without merit. In Virginia, "a statute of limitations is tolled until a person intentionally misled by a putative defendant could reasonably discover the wrongdoing and bring action to redress it." *F.D.I.C. v. Cocke*, 7 F.3d 396, 402 (4th Cir. 1993). "The character of fraud necessary to toll the statute must be of a variety involving moral turpitude. A defendant must intend to conceal the discovery of the cause of action by trick or artifice and must have thus actually concealed it from the plaintiff in order for the exception to apply." *Id.* (quoting *Richmond Redev. & Hous. Auth. v. Laburnum Constr. Corp.*, 80 S.E.2d 574, 582 (Va. 1954)). As discussed, by July 2019, Racklin was on notice that those accounts would not be assigned to her and fails to point to any evidence in the record that would tend to show that Zeta employees explicitly or implicitly told her that she would take over those accounts from Chad Miller post-August 2019.

Racklin commenced her lawsuit against Zeta on August 13, 2021, more than two years after she reasonably should have discovered the alleged fraud, Count I fraud in the inducement claim is time barred.

      B.   Breach of Contract, Unjust Enrichment, and VWPA Claims (Counts II-VII)

Racklin claims that Zeta (i) breached the 2019 Plan by failing to honor the 5% commission payment provision and (ii) breached the post-2019 Plan agreements and 2018 offer letter by withholding Racklin's commission payments and salary after July 2021, while also arguing that the 2019 Amendment, 2020 Plan, and 2021 Plan are all invalid because she executed those contracts under duress. [Doc. No. 149], at 21-24. Zeta contends that the (i) 2019 Plan, (ii) 2019 Amendment, (iii) 2020 Plan, and (iv) 2021 Plan are all valid contracts and that it did not breach those contracts, having completely fulfilled its obligations under the terms of those agreements, and that its refusal to pay Racklin's salary was entirely consistent with her offer letter and the company's policies. [Doc. No. 137], at 17-21.

      i.   ***Verizon Commission Payments (Counts II-III)***

Racklin alleges that Zeta breached the 2019 Plan by refusing to pay her 5% commissions on the Verizon deal—closed by Chad Miller in March 2020—but has failed as a matter of law to present sufficient evidence in support of that claim.

"The elements of breach of contract under Virginia law are '(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *JTH Tax, LLC v. Shahabuddin*, 477 F. Supp. 3d 477, 481 (E.D. Va. 2020) (quoting *Filak v. George*, 594 S.E.2d 610, 619 (Va. 2004)). Racklin executed the 2019 Plan on March 10, 2019. [SUF], ¶ 30. Under the 2019 Plan, Racklin would be eligible to receive commissions in the amount of 5% of GRR on ZX deals

she brought to Zeta. [SUF], ¶ 32; *see also* [Stoler Decl.], Ex. 1 (Racklin Dep. Tr.) at 219:21-220:3 ("Q. So under your 2019 commission plan as we've discussed, if you bring in a deal, the account is assigned to you, and you close that account, you get 5 percent commission on it; right? A. Yes."). Although Racklin worked on a VF Verizon deal for several months in 2019, a Verizon deal (which Racklin contends was based on her efforts on the VF pilot) did not close until March 2020, after the restructuring of the Verizon account and the appointment of Chad Miller to be the sole lead on the Verizon account. Accordingly, Miller was credited with closing that deal and under the terms of the 2019 Plan, Racklin was not entitled to any Verizon commission payments. [SUF], ¶¶ 43, 47; [RSUF], ¶ 47.

Racklin's 5% commission claim also fails in light of the 2019 Amendment, which Racklin signed on June 25, 2019. The 2019 Amendment specifically provides for Racklin to receive a 3% commission on any ZX deals that any Zeta sales representative closed with Verizon, for a period of up to three years. [SUF], ¶ 44; [Stoler Decl.], Ex. 18. Accordingly, the 2019 Amendment, not the 2019 Plan, is the operative agreement with respect to the payment of commissions on the Verizon account.

Ostensibly recognizing the effect of the 2019 Amendment on her claim, Racklin contends that the 2019 Amendment as well as the 2020 Plan, which lowered Racklin's Verizon commission payments from 3% to 1.5%, are invalid because she executed those agreements under duress. [Doc. No. 149], at 21-22.

Duress is "the application of undue pressure in a contractual bargaining process through the use of improper threats or physical force." *Martin v. NAES Corp.*, 2013 WL 5945655, at *5 (W.D. Va. Nov. 6, 2013) (quotation omitted).[13] Under Virginia law, however, "[d]uress is not

_____

[13] "Virginia courts have recognized the existence of three standards for dealing with duress but have never formally adopted one: (1) the ancient doctrine calls for a threat sufficient to deprive a constant and courageous man of his free

readily accepted as an excuse, and must be proven by clear and convincing evidence." *Pelfrey v. Pelfrey*, 487 S.E.2d 281, 284 (Va. 1997) (internal quotation marks omitted). "Duress exists when a defendant commits a wrongful act sufficient to prevent a plaintiff from exercising his free will, thereby coercing the plaintiff's consent." *Goode v. Burke Town Plaza, Inc.*, 436 S.E.2d 450, 452 (Va. 1993). "Virginia courts have been particularly hesitant to accept the exertion of economic pressure as a form of duress." *Lee v. Fairfax Cty. Sch. Bd.*, 621 F. App'x 761, 762 (4th Cir. 2015) (per curiam) (citation omitted); *see also Goode*, 436 S.E.2d at 452-53 ("Because the application of economic pressure by threatening to enforce a legal right is not a wrongful act, it cannot constitute duress." (citation omitted)); *Seward v. Am. Hardware Co.*, 171 S.E. 650, 662 (Va. 1933) ("A contract reluctantly entered into by one badly in need of money without force or intimidation and with full knowledge of the fact is not a contract executed under duress." (citation omitted)).

Racklin claims that she signed the post-2019 Plans under duress as a result of Gerber and Martella's "improper threats" to withhold commission payments and her salary (which they dispute). Those threats, Racklin contends, prevented her from exercising her free will, as evidenced by her suffering a panic attack the day after she signed the 2019 Amendment because she "is the primary breadwinner in her family and the threat of not receiving commissions had a profound impact" on her. [RSUF], ¶ 46; [Racklin Decl.], ¶¶ 13-15; *see also* [RSUF], ¶ 46 (Racklin claims she executed the 2019 Amendment under duress because Geber refused to pay Racklin any Verizon-related commissions unless she signed the amended agreement); [RSUF], ¶ 57 (Racklin claims she executed the 2020 Plan under duress, which still provided for Verizon commission

---

will; (2) the modified doctrine calls for a threat sufficient to overcome the will of a man of ordinary firmness or courage; and (3) a modern version calls for a determination of whether the threat actually overcame the will of the person threatened." *Todd v. Blue Ridge Legal Servs., Inc.*, 175 F. Supp. 2d 857, 863 (W.D. Va. 2001) (citations omitted).

payments, albeit on amended terms, because Martella told Racklin that "she would not receive her salary or commissions if she did not sign."); [Doc. No. 149], at 22 (Racklin claims she executed the 2021 Plan under duress without further explanation).

Racklin does not allege any use, or threats, of physical force; and there is no evidence that her salary or commission payments had actually been withheld during the periods when Racklin was discussing or considering these agreements. *Cf.* [Doc. No. 137], at 18 n.15 (Zeta pointing out Racklin only identified one instance, in March 2020, where her Verizon commissions were underpaid). She was not entitled to any Verizon-related commissions under the 2019 Plan. Racklin's only opportunity to obtain commissions on a Verizon account that she was not assigned and sale she did not close was through the 2019 Amendment. Moreover, she reviewed the 2019 Amendment on May 29, 2019 but did not sign it for more than a month (June 25, 2019), and did not return it to Zeta until July 1, 2019. [SUF], ¶ 46; [Stoler Decl.], Exs. 18-20; [*id.*], Ex. 1 (Racklin Dep. Tr.) at 232:15-233:21. For the 2020 Plan, Zeta first presented it to Racklin on April 9, 2020. [SUF], ¶ 55; [Stoler Decl.], Ex. 1 (Racklin Dep. Tr.) at 261:23-262:19. Racklin refused to sign the Proposed Plan for two weeks while she negotiated its terms, [SUF], ¶ 57; [Stoler Decl.], Exs. 22-31, and the final, executed version of the 2020 Plan included terms more favorable to Racklin, including a higher commission rate than originally proposed. [SUF], ¶ 57. Racklin never repudiated any of the post-2019 Plan agreements. *See Todd*, 175 F. Supp. 2d at 865 ("Prompt repudiation of an agreement is a factor to be taken into consideration in a duress analysis."); *Freedlander, Inc. v. NCB Nat'l Bank of N.C.*, 706 F. Supp. 1211, 1222 (E.D. Va. 1988) (finding plaintiffs' acceptance of four months' worth of payments did "not rise to the level of ratification" but nonetheless "further discredit[ed] their claim that their free will was broken at the time they entered into the" agreement). Following both the execution of the 2019 Amendment and 2020

Plan, Racklin continued to receive, and accept, her commission payments under the terms of the new agreements.

Based on these undisputed facts, as a matter of law, Racklin has clearly failed to carry her heavy burden of showing that she executed these agreements under duress. *See Freedlander*, 706 F. Supp. at 1218 (finding no duress where plaintiffs had "five weeks from the time" they received the first draft of the agreement and "accepted the benefit of the terms of the [agreement] once the duress had passed"); *Smith v. Purnell*, 2011 WL 6140868, at *7 (E.D. Va. Dec. 9, 2011) (finding no duress where plaintiff, who informed defendant of her "difficult financial position," "acted deliberately and with complete knowledge of the fact that she was accepting a sum less than what she claimed to be due to her in full satisfaction"); *Todd*, 175 F. Supp. 2d at 864-65 (rejecting plaintiff's duress claim where she negotiated the disputed agreement throughout the course of a day and did, or rather should have known of, legal remedies to pursue).

Because the 2019 Amendment is a valid contract and clearly governed her Verizon commissions*, see* [Doc. No. 149-17], Ex. 17 ("The terms below are an amendment to your existing 2019 commission agreement."), Racklin's claim that she is entitled to 5% commissions on Verizon revenue pursuant to the 2019 Plan must be dismissed. Similarly, because the 2020 and 2021 Plans were not entered under duress, those agreements validly govern Racklin's Verizon commission payments as well.

Racklin next argues that even if the 2020 and 2021 Plans are valid, they nevertheless constitute improper, unenforceable amendments to the 2019 Amendment, which she contends could not be amended. *See* [Doc. No. 149], at 22 ("Ms. Racklin also alleges that the further reduction of her Verizon commissions from 3% to 1.5% under the 2020 and 2021 Plans is not enforceable because the 2019 Amendment, which guaranteed Ms. Racklin 3% Verizon

commission for three years, could not be amended."); [RSUF], ¶ 44. But the 2019 Amendment includes no prohibition against further amendments. [Stoler Decl.], Ex. 18. The 2020 and 2021 Plans—written agreements signed by both parties—are therefore valid and controlling. *Cf. Orthopaedic & Spine Ctr. v. Muller Martini Mfg. Corp.*, 737 S.E.2d 544, 549 (Va. Ct. App. 2013) (explaining that a "modification of a contract must be shown by clear, unequivocal and convincing evidence, direct or implied" (cleaned up)). Nor does the plain language of the 2019 Amendment guarantee Racklin Verizon commission payments for 3 years. [Stoler Decl.], Ex. 18 ("Commissions will be paid monthly . . . for *a period of up to* three years." (emphasis added)).

For the above reasons, Racklin has failed to present evidence of a genuine dispute of material fact concerning whether the 2019 Amendment *guaranteed* 3% Verizon commission payments for a period of 3 years and prohibited any future amendments or the 2019 Amendment and the 2020 and 2021 Plans were entered into under duress. The Court therefore grants summary judgment in favor of Zeta on Counts II and III.[14]

**ii.**     ***Withheld Commission Payments and Salary Post-July 2021 (Counts IV-VII)***

In Counts IV-VII, Racklin claims Zeta breached the offer letter and 2021 Plan, and violated the VWPA, by failing to pay Racklin her salary and commission payments from July 29, 2021 (the date Zeta placed Racklin on unpaid administrative leave) until January 21, 2022 (the date Racklin informed Zeta of her resignation) (the "ULOA Period").

1.  Refusal to Pay Salary

Zeta argues that its decision not to pay Racklin her salary during the ULOA Period is entirely consistent with the offer letter and its company policies. [Doc. No. 137], at 20.

---

[14] Racklin has alternatively filed an unjust enrichment claim (Count III), which must also be dismissed given the existence of express contracts. *See Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988) (stating "an action for unjust enrichment is quasi-contractual in nature and may not be brought in the face of an express contract" (citation omitted)).

Specifically, Zeta claims that the undisputed record shows that between July 12, 2021 (the date Racklin first began taking PTO) and July 29, 2021, the date the ULOA period began, Racklin (i) violated Zeta's PTO policy by taking more than two consecutive weeks of unapproved PTO; (ii) refused to report to work; and (iii) refused to have any contact with her supervisors. [*Id.*], at 20. Racklin, in response, characterizes those reasons as *post hoc* justifications, arguing that disputed facts show that (i) she offered to return to work once Zeta completed its investigation; and (ii) she was unaware that her PTO leave violated Zeta's policy. [Doc. No. 149], at 23-24.

Zeta promised in the offer letter to pay Racklin an annual base salary of $200,000 "in consideration of [Racklin's] *services*." [Stoler Decl.], Ex. 9 at ¶ 2(a) (emphasis added). When she signed the letter, Racklin agreed to "comply with and be bound by the operating policies, procedures and practices of the Company." [SUF], ¶ 25; [Stoler Decl.], Ex. 9 at ¶ 1. Zeta's 2021 employee handbook clearly states that (i) an employee's "manager MUST approve" the PTO request and, if "the PTO request is not approved, the leave may considered unexcused leave, and the employee may be subject to disciplinary action up to and including, termination of employment" and (ii) employees cannot take more than two consecutive weeks of PTO without approval from the Zeta COO. [Stoler Decl.], Ex. 10 at 43-44; [SUF], ¶ 92.

There is no evidence that Racklin received approval before she began taking PTO on July 12, as company policy required. [SUF], ¶ 92; [RSUF], ¶ 92.[15] Thus, Racklin began her period of PTO without any explicit approval and Racklin never obtained the required approval from Zeta's COO for PTO beyond two weeks. Racklin claims she was unaware of this policy; but she received

---

[15]Racklin's counsel sent Zeta's counsel, Brian Fong, an email on July 10 suggesting Racklin use PTO while Zeta investigated Racklin's complaints. [RSUF], ¶ 92. Fong never responded to the email, nor did anyone else on behalf of Zeta respond to Racklin's PTO request. [RSUF], ¶ 92. While Racklin emailed McCarthy on July 12, 2021, she only indicated that she "need[ed] to take PTO *this week* to deal with personal matters;" [Doc. No. 149-32], Ex. 32 (emphasis added), McCarthy never responded to Racklin's email.

a link to the 2021 employee handbook on at least five occasions before she began her PTO on July 12. *See* [Stoler Decl.], Ex. 1 (Racklin Dep. Tr.) at 481:24-484:9 (links sent on June 7, June 18, June 25, July 2, and July 9). As stated in the employee handbook, Racklin's PTO under these circumstances was "unexcused leave," subjecting her to disciplinary actions, and in direct violation of the handbook's requirement that any leave longer than two weeks receive COO approval.

Racklin claims that the only reason she did not perform work during the ULOA Period was because Zeta never invited her to return to work and cut off her electronic access. [RSUF], ¶¶ 99, 101. But as Zeta correctly points out, Racklin made it clear in her various demand letters that she refused to return to work as her job was then structured; specifically, she would not return to work if forced to continue working under her supervisors, Martella and McCarthy. *See, e.g.*, [Stoler Decl.], Ex. 70 at 3-4 (demand letter stated that: "[Racklin] can no longer continue her employment without risking further harm," "[her] continued employment with Zeta under the circumstances is untenable," and asked that Martella and McCarthy "have no direct communication with Ms. Racklin"); [Stoler Decl.], Ex. 1 (Racklin Dep. Tr.) at 328:24-329:3 (Q. "Were you willing to come back to work and report to Mr. Martella and Mr. McCarthy? A. Under the conditions, no."). Racklin did not offer to report to another Zeta employee, offering only to provide assistance "about any needed client communications and/or messaging around her absence." [Doc. No. 149-30], Ex. 30. Because Racklin violated company policy and clearly indicated she had no intention of returning to Zeta, as her job was then structured, instead demanding a $2.85 million settlement, Zeta did not breach the offer letter by placing Racklin on unpaid administrative leave and refusing to pay her salary after July 29, 2021 as she was not providing any "services" to Zeta.

Relatedly, Racklin's VWPA claim fails because the statute only covers "earned wages," and does not apply if the "failure to pay was because of a bona fide dispute between the employer

and its employee." *See* Va. Code. § 40.1-29(C), (E). Moreover, Racklin did not render any services to Zeta after going on PTO on July 9th and, thus, did not earn any wages. *Cf. B.P. Solar v. Jones*, 641 S.E. 2d 124, 126 (Va. Ct. App. 2007) (noting, in a separate context, that the Virginia Court of Appeals defined wages as "compensation given to a hired person for his or her services" to compensate employees "based on time worked or output of production" (citations omitted)); *Bay Concrete Const. Co. v. Davis*, 600 S.E.2d 144, 150 (Va. Ct. App. 2004) (finding, in a separate context, that a claimant, due to his inability to work, "was not able to earn any wage during the period in question, and thus, he had no 'earnings'"). Therefore, Racklin cannot recover under the VWPA.

### 2.   Refusal to Pay Commissions

Zeta contends that it properly withheld Racklin's June 2021 commission payments due around July 30th and all commission payments thereafter. The 2021 Plan (which the Court has concluded was not entered into under duress and thus valid) provides that Racklin must be "in good standing on the date that the [commissions] are paid by Zeta Global." [Stoler Decl.], Ex. 54 at 1. And the plan defines "good standing" as meaning that Racklin is "not subject to any disciplinary proceedings, [has] not received any disciplinary sanctions and/or [is] not subject to performance management." [*Id.*] The plan also provides that in the "event of uncertainty regarding, or dispute pertaining to, the meaning, interpretation and/or application of any provision of the Plan, Zeta Global's decision will be final and binding." [*Id.*], at 4. Zeta states that Racklin was not in good standing because (i) Martella intended and had attempted to place Racklin on a PIP; (ii) Racklin was in violation of Zeta's PTO policy; and (iii) Racklin refused to report to work or have any contact with her supervisors. [Doc. No. 137], at 20.

The undisputed facts show that by July 6, 2021, Zeta had decided to formally place Racklin on a PIP (discussions pertaining to Racklin's PIP commenced several months beforehand), Stoler Decl.], Ex. 64; and Zeta intended to meet with Racklin the next day to inform her of that decision, [SUF], ¶ 89 Approximately two days after Zeta's attempt to meet on July 7th, Racklin, through counsel, advised Zeta that she refused to have any further direct communications with her supervisors, declared that her continued employment was "no longer tenable" and demanded a $2.85 million settlement of her claims against the company. [Stoler Decl.], Ex. 70. At a minimum, given the decision to place her on a PIP, Racklin was subject to "performance management" as of the time her June 2021 commission payments were due, and her violation of the PTO policy subjected her to disciplinary action. In light of those facts, Racklin fails as a matter of law to present evidence sufficient to establish that Zeta's failure to pay her June 2021 commission payments or any monthly commission payments thereafter was a contractual breach of the 2021 Plan. For the above reasons, the Court grants summary judgment in favor of Zeta on Counts IV-VII.[16]

### C. Sex Discrimination and Hostile Work Environment (Count VIII)

Racklin claims that Zeta discriminated against her by paying her less than similarly situated male employees and subjecting her to a hostile work environment. [Doc. No. 149], at 24-28.[17] Zeta contends that there are no material factual disputes and both claims can be dismissed as a matter of law. [Doc. No. 137], at 21-27.

Title VII makes it unlawful for an employer "to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–

---

[16] Racklin's unjust enrichment claim (Count V) must fail as an express contract governs her claim. *See Acorn*, 846 F.2d at 926.

[17] In her opposition, Racklin clarifies that Count VIII does not relate to the Verizon account assignment to Miller. [Doc. No. 149], at 25.

2(a)(1). To establish a prima facie case of discrimination, a plaintiff must allege facts that show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). "After the plaintiff establishes this prima facie case of discrimination, the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason for the'" challenged conduct. *Smith v. Va. Hous. Dev. Auth.*, 437 F. Supp. 3d 486, 507 (E.D. Va. 2020) (citation omitted). If the employer carries this burden, "the plaintiff then has an opportunity to prove by a preponderance of the evidence that the neutral reasons offered by the employer 'were not its true reasons, but were a pretext for discrimination.'" *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (citation omitted).

    **i.**    ***Sex Discrimination***

Racklin claims Zeta discriminated against her on the basis of gender by (1) paying her a smaller commission percentage than Miller on the Verizon revenue; (2) capping her commission percentage at 5% while another male employee, Zaner, was eligible for 6% commissions; (3) offering $20,000 new logo bonuses only to male employees Zaner, Winnard, and Walters and not her; and (4) providing fewer restricted stock units, or lesser value for those units, than some of her male colleagues. [Doc. No. 149], at 24-25.

"Where, as here, the prima facie case of wage discrimination is based on comparators, the plaintiff must show that she is paid less than men in similar jobs." *Spencer v. Va. St. Univ.*, 919 F.3d 199, 207 (4th Cir. 2019) (citation omitted). "While there is no bright-line rule for what makes two jobs 'similar' under Title VII, courts consider 'whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor,

and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision.'" *Id.* (citations omitted).

Zeta claims that Miller and Racklin are not similarly situated because Miller had a different job title and responsibilities as well as different supervisors. Racklin argues that Miller's "hybrid" role, that is, his responsibility for both securing new business and overseeing client relationships in his book of business, was not "entirely unique" and that he, like herself, reported to Steele and Martella. [Doc. No. 149], at 24-25; [RSUF], ¶ 34. In her response to Zeta's statement of material facts, Racklin does not dispute that while Miller reported to Martella for a short period of time, he was "subsequently assigned to report to Tom Walsh, Zeta's head of strategic partnerships." [SUF], ¶ 54. And the record sufficiently establishes that Miller "originally reported to" Steele but then "subsequently began reporting to Eric Presbrey, Zeta's President of ZX." [SUF], ¶ 10; [RSUF], ¶ 10. It is also undisputed that Racklin and Miller held different job titles: vice president and senior vice president, respectively. Finally, Racklin fails to proffer substantive evidence establishing, or at least allowing a reasonable factfinder to infer, that Racklin and Miller had the same job responsibilities, only claiming that she, at one time, also served in a hybrid role and worked to grow client business. [RSUF], ¶¶ 8-9. Such "generalized similarity is not enough to survive a motion for summary judgment because jobs with similar titles and 'only vaguely corresponding responsibilities' are not similarly situated." *Chapman v. Wal-Mart*, 2021 WL 2379810, at *6 (W.D. Va. June 10, 2021) (citation omitted) (rejecting plaintiff's claim that comparators were "comparable enough" that a reasonable juror could find them similarly situated where plaintiff only offered "broad generalizations"). Moreover, it is undisputed that Martella, upon joining Zeta, made efforts to eliminate any hybrid responsibilities Racklin may have possessed. [SUF], ¶ 9; [Racklin Decl.], ¶ 5.

28

Given the notable differences between Racklin and Miller, her claim based on Miller as a comparator must fail as a matter of law. *See Spencer*, 919 F.3d at 207 ("While Title VII's 'similarity' requirement demands less of plaintiffs than the Equal Pay Act's 'equality' requirement, it is not toothless: the plaintiff must provide evidence that the proposed comparators are not just similar in *some* respects, but 'similarly-situated in *all respects*.'" (emphasis in original) (citation omitted)); *Monk v. Potter*, 723 F. Supp. 2d 860, 877 (E.D. Va. 2010) ("[T]wo employees who do not report to the same supervisor, do not have the same job title, or do not have the same responsibility level, are not similarly situated." (citing *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008))).

Additionally, Racklin's discrimination claim based on RSUs must likewise fail. Racklin received more restricted share units than Brooke (75,000 to 50,000), [SUF], ¶ 79, 25% of which vested in connection with the IPO, for a total value of $190,172—approximately $65,000 more than Brooke, [Doc. No. 153]; [RSUF], ¶ 79.

With respect to Racklin's claims based on other comparators (Zaner, Winnard, and Walters), Zeta does not challenge whether they are appropriate comparators, but rather argues that Racklin has failed to produce sufficient evidence to present a genuine material dispute in terms of whether those comparators actually received more favorable treatment. [Doc. No. 151], at 11-12.

When viewed most favorably to Racklin, the record establishes that Zaner, Winnard, and Walters were entitled to receive, but were never paid, New Logo Bonuses ("NLB").[18] [SUF], ¶¶

---

[18] Zeta disputes that it had included NLBs as part of Zaner, Winnard, or Walters' commission plans or offer letters. Nevertheless, sufficient evidence exists to allow a reasonable inference that they were, in fact, offered an NLB. For example, on July 13, 2020, the day before Walters received his formal offer letter from Zeta, Michael Curto, a Zeta employee, emailed Walters his offer compensation details, which included "New Logo Bonus – Any new and approved logo signed in 2020 - $20k per new logo." [Doc No. 149-23], Ex. 23; [Stoler Decl.], Ex. 33. Later, on January 20, 2021, Walters forwarded this email to Martella, writing in part, "here are the two written offers from Mike w [sic] the new logo language." [Doc. No. 149-23], Ex. 23. There is also a text exchange between Racklin and Zaner, dated January 20, 2021, in which she asks: "is your comp plan paying you at 5% and a 25k bonus for new logos? We are all

60-62. Racklin contends that regardless of whether it paid NLBs, Zeta provided the opportunity for NLBs to these men but not her. [Doc. No. 149], at 24. But even accepting that proposition, the offer of an NLB by and of itself does not satisfy Racklin's prima facie burden. Racklin needs to show that she was "paid less," or at least had less of an economic opportunity, than the comparators.  *See Spencer*, 919 F.3d at 207; *see also Hernandez v. Data Sys. Int'l, Inc.*, 266 F. Supp. 2d 1285, 1298 (D. Kan. 2003) ("An employer can discriminate against its highest paid employee by preventing him or her from earning as much as a non-protected employee would have earned under identical facts.").

The undisputed evidence shows that Racklin and these three other employees had fundamentally different compensation structures that cannot be compared based solely on NLBs. Two of the comparators' base salaries were lower than Racklin's, [Doc. Nos. 138-32, 138-33], Ex. 32 (Zaner: $190,000), Ex. 33 (Walters: $185,000), and unlike Racklin's compensation plan, the commission plans for all three comparators capped their commissions at $30,000 based on achievement of certain management objectives, and did not allow for any of them to earn commissions on deals they did not close. [Doc. Nos. 138-38, 138-39, 138-40], Exs. 38-40. In contrast, Racklin's commissions were not capped and she could earn 3-5% commissions on a variety of ZX accounts as well as 1.5% of all GRR on the Verizon deal—despite not closing that sale. [Stoler Decl.], Exs. 31, 54. Additionally, while not addressed by the parties, Racklin's 2021 Plan provides for several potential deal bonuses. [Stoler Decl.], Ex. 54. Overall, Racklin earned more and/or had the opportunity to earn more than these three comparators. [Stoler Decl.], Ex. 3 (Gerber 30(b)(6) Dep. Tr.) at 143:10-15 ("[W]e paid [Racklin] higher than her male peers. We gave her a higher equity package and we created and amended incentive plan to acknowledge her

---

supposed to have the same sales comp plan. We always have had one plan;" and Zaner replies, in part, "Interestingly enough[,] I'm at 6% and $20k for new logos." [Doc. No. 149-21], Ex. 21.

role as a participant in a sale to somebody else. All of those are not standard at Zeta."). Based on the undisputed facts, a reasonable juror could not find that Zeta treated Racklin less favorably than similarly situated male employees on the basis of a potential NLB payment.

Likewise, for similar reasons, Racklin's claim based on Zaner's 6% commission rate fails as a matter of law.[19] Receiving a lower commission rate than a similarly situated male employee may state a prima facie case of discrimination. *Hernandez*, 266 F. Supp. 3d at 1298 (finding plaintiff set forth prima facie wage discrimination claim where his "rate of commission was lower than similarly situated white employees"). But here, as with the NLBs, the disparity in commission rates does not in and of itself carry Racklin's burden. Zaner's commission plan caps his commissions at $30,000 and there is no evidence he earned more than this amount in commissions, [Stoler Decl.], Exs. 39, 43,[20] while Racklin's commissions were uncapped, she made more money than Zanner and received commissions under a more favorable arrangement unique to her, *i.e.*, received 1.5% commissions on the Verizon deal despite not closing the sale.[21] Therefore, the difference in the commission rates alone, if it in fact existed, is not enough to state a prima facie case for wage discrimination under Title VII.

---

[19] There is conflicting evidence concerning whether Zaner in fact had a 6% commission rate. Neither Zaner's commission plan nor offer letter includes a reference to a 6% commission rate. [Stoler Decl.], Exs. 32, 39. However, there is a text message exchange between Racklin and Zaner where Zaner implies he believes he is entitled to a 6% commission rate, [Doc. No. 149-21], Ex. 21, as well as Gerber's deposition testimony, *see* [Doc. No. 149-13], Ex. 13 (Gerber Dep. Tr.) at 145:6-9 ("So if [Zaner's] stating in this particular case that he's at 6 percent, there's no reason for me to believe that he would be telling her something that's not true.").

[20] In accordance with his offer letter, Zaner was entitled to and did take a monthly "recoverable draw" of $6,000 for a period of 5 months in addition to receiving his $30,000 bonus. [Stoler Decl.], Exs. 32, 43. By contrast, Racklin's offer letter entitled her to take a monthly "non-recoverable draw" of $5,000 for a period of 12 months. [Stoler Decl.], Ex. 9 at ¶ 2(c).

[21] *See* [Stoler Decl.], Ex. 3 (Gerber 30(b)(6) Dep. Tr.) at 167:17-168:1 ("So total compensation is different than the calculation to receive the total compensation is an output. The formula is an input. Melissa was making far more than Eric Zaner was based on having a percentage of Verizon. That was unique to her being paid on an account that was assigned to somebody else as well as being paid a percentage of Charter. So her total compensation was much, much higher than Eric Zaner's.").

### ii. *Hostile Work Environment*

In order to establish a claim for hostile work environment, a plaintiff must demonstrate that the alleged conduct "(1) was unwelcome; (2) resulted because of her gender, disability, or prior protected activity; (3) was sufficiently severe or pervasive to alter the conditions of her employment; and (4) was imputable to her employer." *See Pueschel v. Peters*, 577 F.3d 558, 564-65 (4th Cir. 2009) (internal quotation marks omitted). To satisfy the second element, plaintiff must show that "but for the employee's gender, [she] would not have been the victim of the discrimination." *Nathan v. Takeda Pharm. Am., Inc.*, 890 F. Supp. 2d 629, 641 (E.D. Va. 2012) (quoting *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008)).

The Fourth Circuit has delineated the kind of conduct that will and will not satisfy the second element (*i.e.* causation) requirement within the context of verbal interactions between employer and employee. Simply not getting along with others and "personality conflicts" are not enough. *Ziskie*, 547 F.3d at 226 ("Some persons, for reasons wholly unrelated to race or gender, manage to make themselves disliked."). Finding causation is particularly challenging where "most of the comments and behavior of which [a plaintiff] complains [were] not about sex." *Id.* at 227. For instance, calling a coworker a "moron," and failing to cooperate in common tasks can be classified as "hostile," but is a "far cry" from those cases of obviously sex-related conduct, such as where "a male soccer coach incessantly talked about his female players' sex lives and bodies" and "where male employees repeatedly demonstrated sexual practices on a mannequin in front of [a female employee]," *id.* (citing *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 691-94 (4th Cir. 2007); *Ocheltree*, 335 F.3d at 328), or where the plaintiff is "subjected to repeated use of sexual epithets," *id.* (citing *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184-86 (4th Cir. 2001); *EEOC v. Sunbelt Rentals*, 521 F.3d 306, 310-12 (4th Cir. 2008)). Moreover, no inference of sex-

based animus is reasonable where a female employee claimed "that she received inadequate coaching, had to do work over and over, was unreasonably required to work late the night of an office Christmas party, and did not have access to the same work opportunities as other managers." *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 281 (4th Cir. 2000). In short, a reasonable jury must be able to see the "hostility as a product of gender animus rather than the kind of personality conflict that pervades many a workplace." *Ziskie*, 547 F.3d at 227.

In the absence of sexual advances or propositions, a plaintiff may prove sex-based discrimination through two other evidentiary routes: (1) "the employee may show that she 'is harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace'" and/or (2) "the employee may offer 'direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.'" *Westmoreland v. Prince George's Cty.*, 876 F. Supp. 2d 594, 615 (D. Md. 2012) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998)); *see also Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011); *English v. Pohanka of Chantilly, Inc.*, 190 F. Supp. 2d 833, 843 (E.D. Va. 2002). As discussed below, with one arguable exception, there is no evidence of sex-specific and derogatory terms directed at Racklin; and Racklin essentially presents her sexual harassment claim based on the disparity in treatment between men and women, which "is the road less traveled in that it is generally the most exacting by which to establish the because of element." *Westmoreland*, 876 F. Supp. 3d at 615 (citations omitted).

Here, Racklin has put forward evidence that *she*, and other women at Zeta, believed, at the time, that male Zeta employees treated her harshly on the basis of sex.[22] The weekly sales pipeline

---

[22] *See, e.g.*, [Doc. No. 149-25], Ex. 25 at PageID# 5181 (email exchange between Racklin and the acting head of HR, Denise Lang, where Racklin voiced concerns about being excluded from a July 2020 account review and wrote: "As

calls served as the main forum for Racklin's alleged abuse. On those sales calls, Martella and McCarthy spoke to Racklin "in a critical and condescending" tone while "banter[ing] with and encourage[ing] male colleagues." [Racklin Decl.], ¶ 25; [Doc. No. 149-40], Ex. 40 (text messages). One of the worst calls from Racklin's perspective took place on April 15, 2021. [Doc. No. 149-5], (Stone Dep. Tr.) at 166:16-167:22 (female colleague checked in on Racklin after an April 15, 2021 sales pipeline call that was particularly "awful"); [*id.*], (Stone Dep. Tr.) at 51:5-52:21 (describing April 15th call, where Racklin was only woman on the call, as "shocking and highly inappropriate," as McCarthy and Martella "cut[] [Racklin] off" and were "hostile" and "belittling" but not treating male employees in the same manner).

While the evidence viewed most favorably to her establishes that Racklin perceived harassment on the basis for her sex, and the comments made to her were disrespectful and demeaning, she has presented no evidence of gender-based comments during any of those calls. In fact, the evidence shows that Martella made his comments against the backdrop of Racklin having fallen far behind her revenue generation goals,[23] and that during the sales pipeline calls, Martella's criticisms extended to male employees as well, including Racklin's direct supervisor, Sean Welsh.

---

a female, overseeing our Human Resources, I'm sure you understand why I'm disappointed to not have the fair opportunity like my peers."); [Doc. No. 149-40], Ex. 40 at PageID # 5374 (text message between Racklin and another female employee, indicating Racklin was subjected to harsh criticism during sales call: "[Racklin:] I'm singled out. That's what was clear to so many people. It's clearly only me, yet I have the most activity. [Kelsy:] I mean – boys club.").

[23] For example, under the 2020 Plan, Racklin's sales target (gross revenue) was set at $6,000,000. [Stoler Decl.], Ex. 31. Racklin did not meet that target. And beginning as early as August 2020, Martella repeatedly noted problems with Racklin's failure to meet her sales quota. *See* [Stoler Decl.], Ex. 45 at PageID # 4493 ("[W]e are still seeing no progress to close new deals. . . . Melissa will fall terribly short of her $6 million annual goal."); Ex. 46 (August 2020 email noting Racklin might end the year "90% short of her quota"); Ex. 47 (October 2020 email noting Racklin might only reach "approximately 16% of her annual quota" and that while Zeta "continue[s] to support Melissa and her deals and pipeline building . . . . it doesn't look like she is going to meet the metrics required for 2020 and this would follow a 2019 year in which she did not make quot[a] as well"); Ex. 49 (December 2020 email contemplating firing Racklin because during "the first two quarters [of 2020], she generated zero revenue against an annual quota of $6+ million"); Ex. 64 (April 2021 draft PIP noting that Racklin's 2020 "revenue quota set at $6M" but her "revenue achievement was $535,714"). Martella asked McCarthy to place Racklin on a PIP in April 2021, but McCarthy did not feel comfortable delivering the PIP due to a lack of familiarity with Racklin, [McCarthy Decl.], ¶¶ 14-16, although he eventually also had problems with Racklin's performance, [*id.*], ¶¶ 18-22, 25.

*See* [Welsh Decl.], ¶¶ 48-49. Welsh also described Martella's "management style [as] abrasive, blunt, and rude towards everyone on the team" and found Martella "very difficult to work with" and "patronizing and even condescending." [Welsh Decl.], ¶¶ 44-46; *see Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 262 (4th Cir. 2001) (stating that the fact that the alleged harasser "was just an indiscriminately vulgar and offensive supervisor, obnoxious to men and women alike" "undercut[]" the plaintiff's "claim to a substantial extent"). Similarly, Plaintiff received complaints from men at Zeta about McCarthy's management style, with one man describing McCarthy as a "loose cannon" and another stating that McCarthy was "intense to work for" and a tough boss. [Stoler Decl.], Ex. 1 (Racklin Dep. Tr.) at 580-85, 596-600; [McCarthy Decl.], ¶ 24 (McCarthy made it a point "to ask critical questions and to challenge all of [his] salespeople during pipeline calls"). Overall, the only gender-based comment she has presented made by a Zeta male employee is a statement by McCarthy to her that "women are typically bad at math." [Stoler Decl.], Ex. 1 (Racklin Dep. Tr.) at 569:23-570:24. The other comments go to Martella and McCarthy's general "tone" and "condescending" behavior towards Racklin. [Doc. No. 149], at 26.

In sum, when construed most favorably to Racklin and drawing all reasonable inferences in her favor, the evidence presented is insufficient as a matter of law to allow a reasonable juror to find that Racklin's treatment was *because of* her sex. *See Atkins v. Smyth Cty. Va. Sch. Bd.*, 2022 WL 584080, at *6 (W.D. Va. Feb. 25, 2022) (granting summary judgment because plaintiff failed to meet her burden of proof that treatment was based on sex as the only support in the record was "vague, conclusory testimony" that the supervisor "did not behave the same way toward his few male coworkers").[24]

---

[24] Racklin presents in support of her claim the deposition testimony from Shannon Stone that she also felt discriminated against based on her gender and what other Zeta employees purportedly told her about Zeta's culture. [Doc. No. 149], SAF ¶ A. Racklin also offers several demand letters involving other women at Zeta, who worked in different departments and reported to different supervisors [Doc. No. 149], SAF  ¶ M; [Doc. No. 149], Exs. 41-43. But Stone,

The evidence is also insufficient as a matter of law to establish that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up). Establishing such a qualifying environment is a "high bar." *Sunbelt Rentals*, 521 F.3d at 315. "[I]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019) (alteration in original) (quoting *Sunbelt*, 521 F.3d at 315). "[R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." *Id.* (alterations in original) (quoting *Sunbelt*, 521 F.3d at 315-16).

Here, the evidence is sufficient to establish that Racklin subjectively felt that she was being subjected to an abusive working environment. *Harris*, 510 U.S. at 21. Objectively, however, the evidence is insufficient to allow a reasonable fact finder to conclude that the environment was sufficiently severe or pervasive. Rather, the conduct described is more akin to other kinds of offensive workplace conduct that the Fourth Circuit has found insufficient to establish a hostile environment under Title VII. *See, e.g., Perkins*, 936 F.3d at 209 (affirming district court's finding of lack of severe or pervasive conduct even though employees testified that "African American

---

like Racklin, only testified to her perceptions based on vague complaints about how Martella and others at Zeta treated her without any gender references. And the letters and referenced complaints from other women are inadmissible hearsay. *See Greensboro Professional Firefighters Ass'n v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995) ("[Hearsay] is neither admissible at trial nor supportive of an opposition to a motion for summary judgment."); *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251-52 (4th Cir. 1991) (affirming district court's ruling that unauthenticated letter constituted inadmissible hearsay and could not be relied upon in deciding summary judgment motion); *Teeter v. Loomis Armored US, LLC*, 2021 WL 6200506, at *10 (E.D.N.C. Nov. 23, 2021) (ruling plaintiff "may not rely on his account of his coworkers' statements to prove the truth of the matters they assert" where he failed to show that they were non-hearsay or an exception applied).

employees were treated less favorably than white employees" and that "some white employees did not talk to and otherwise shunned African American employees"); *Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (per curiam) (yelling, pounding hands on desk, harping on plaintiff's mistake, making "snide comments," playing favorites with employees, and unfairly scrutinizing and criticizing plaintiff did not amount to severe or pervasive harassment); *see also Holleman v. Colonial Heights Sch. Bd.*, 854 F. Supp. 2d 344, 352-53 (E.D. Va. 2012) (granting summary judgment in favor of defendant on severe or pervasive prong despite plaintiffs' allegations that supervisor "treat[ed] female employees with disrespect and disdain by cursing, yelling, berating, and reprimanding, and even suggesting resignation" as those complaints "seem to reflect [plaintiffs'] misgivings with the 'callous behavior [of their] superior[]'" and were more akin to a "personality conflict" (second alterations in original) (quoting *Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir. 2003))). For these reasons, Racklin's hostile work environment claim fails as a matter of law.

### D.   Retaliation and Constructive Discharge (Count IX)

#### i.   *Retaliation*

Racklin claims that she was retaliated against for engaging in protected activity when Zeta (1) refused to pay Racklin her commissions and (2) placed her on unpaid administrative leave, i.e. refusing to pay her salary. Racklin fails to put forth a prima face case as to her commission payments; however, she does establish a prima facie case as to non-payment of her salary. But, as discussed below, Zeta has provided legitimate non-retaliatory reasons for its decision to place Racklin on unpaid leave and Racklin has failed to present sufficient evidence that Zeta's explanations are a pretext for retaliation.

Title VII prohibits employers from "discriminat[ing] against any of [their] employees . . . because [the employees] ha[ve] opposed any practice made an unlawful employment practice by [Title VII], or because [the employees] ha[ve] . . . participated in any manner in an investigation" under Title VII. 42 U.S.C. § 2000e–3(a). The elements of a prima facie retaliation case are: (1) engagement in a protected activity, (2) adverse employment action, and (3) a causal link between the protected activity and the employment action. *See Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004). "Like a discrimination claim, if the plaintiff is able to make out a prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant satisfies its burden of production, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the reason is pretext." *Nathan*, 890 F. Supp. 2d at 644 (internal citation omitted).

1.   Retaliation Based on Withheld Commissions

It is undisputed that Zeta determined Racklin had performance-related issues and intended to place her on a PIP before it received Racklin's July 9, 2021 demand letter. In that regard, Martella and Zeta employees discussed putting Racklin on a PIP as early as August 2020, [Stoler Decl.], Ex. 45, finalized a PIP for Racklin in April 2021, [Stoler Decl.], Ex. 64, and intended to place Racklin on a PIP on July 7, two days before Racklin engaged in protected activity, [SUF], ¶ 89. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted). The actions that led to a decision to place Racklin on a PIP, and thereby making her ineligible for commission payments, "began *before* her protected activity, belying the conclusion that a reasonable factfinder might find that [Zeta's] activity was motivated by" Racklin's

complaints. *Id.* But for Racklin's decision to send a demand letter and take indefinite PTO, Zeta would have formally placed Racklin on a PIP well before her June commissions payments were due to be paid. The timing, therefore, between Racklin's protected activity and Zeta's refusal to pay Racklin her commission payments does not lead to an inference of retaliation as a matter of law. *See, e.g.*, *United States* ex rel. *Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 181 (4th Cir. 2018) ("[W]hen animus already exists between the plaintiff and [her] employer prior to the protected activity at issue, the plaintiff needs to be able to show that [her] protected conduct 'changed' the 'status quo' in some fashion." (citation omitted)); *Buchhagen v. ICF Int'l, Inc.*, 650 F. App'x 824, 830 (4th Cir. 2016) (holding no causation where the "decision to place [plaintiff] on a PIP . . . predate[d] her protected activity).[25]

### 2.   Retaliation Based on Non-Payment of Salary

With respect to her retaliation claim based on the non-payment of her salary, Racklin has presented evidence sufficient to make a prima facie case, including causation.[26] Nevertheless, Zeta

---

[25] Even if the Court were to find that Racklin made out a prima facie case as to her commission payments, the Court would nonetheless grant summary judgment in favor of Zeta on this issue due to Racklin's failure to establish pretext. As discussed, Zeta intended to place Racklin on a PIP prior to her sending her demand letter. If not for Racklin's unavailability on July 7th and subsequent decision to take PTO, Zeta would have formally placed Racklin on a PIP, actions which would have rendered her not in good standing and, consequently, ineligible to receive her June commissions. Although Zeta's counsel explanation to Racklin's counsel in July and November 2021 that Racklin was not in good standing because she was on unpaid leave does not exactly align with the 2021 Plan's definition of "good standing," Racklin has not pointed to anything in the record to suggest that Zeta believed that explanation was false or incorrect, as Zeta continues to put forward that explanation. [Doc. No. 137], at 29; [Doc. No. 151], at 17; *see Price v. Thompson*, 380 F.3d 209, 215 n.1 (4th Cir. 2004) ("[M]ere mistakes of fact are not evidence of unlawful discrimination. Pretext is a lie, not merely a mistake." (cleaned up)); *Collins v. Baltimore City Bd. of Sch. Comm'rs*, 528 Fed. App'x 269, 273 (4th Cir. 2013) (determining that supervisor's potentially "mistaken interpretation" of plaintiff's letter did not constitute evidence of pretext or discrimination). And, more importantly, these two different explanations for why Zeta refused to pay Racklin her commissions (PIP vs. unpaid leave) do not allow a reasonable factfinder to find that Zeta would have paid Racklin her commissions but-for her protected activity since it was Racklin's own conduct that frustrated Zeta's plan to formally place her on a PIP well before her June commissions were due and payable.

[26] "[E]stablishing a 'causal relationship' at the prima facie stage isn't an onerous burden." *Thomas v. City of Annapolis*, 851 F. App'x 341, 350 (4th Cir. 2021). An employee may satisfy his burden "simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers v. City of Laurel*, 895 F.3d 317, 335-36 (4th Cir. 2018). The twenty-day time lapse between Racklin's demand letter and being placed on unpaid leave satisfies the causation element. As a result, the burden shifts to Zeta to produce evidence of a legitimate,

has provided legitimate, nondiscriminatory reasons for placing her on unpaid administrative leave, namely that Racklin violated the company PTO policy and had made clear she had no intention of returning to work. [Doc. No. 137], at 29. The burden, therefore, shifts back to Racklin to present sufficient evidence of pretext.

To carry this burden, Racklin "must establish 'both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct.'" *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (alterations in original) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)). Establishing that retaliation was the "real reason" is functionally equivalent to demonstrating that Racklin "would not have been" placed on unpaid leave "but for [Zeta's] retaliatory animus." *Id.* "To show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Sempowich v. Tactile Sys. Tech, Inc.*, 19 F.4th 643, 652 (4th Cir. 2021) (alteration omitted) (quotation omitted); *Jacobs v. N.C. Admin Office of the Cts.*, 780 F.3d 562, 579 (4th Cir. 2015) (plaintiff may prove pretext "by demonstrating that the asserted justifications, even if true, are post hoc rationalizations invented for purposes of litigation." (citation omitted)). "[S]hifting and inconsistent justifications for taking an adverse employment action[]" can evidence pretext. *Smith v. CSRA*, 12 F.4th 396, 421 (4th Cir. 2021) (noting defendant, at the time of the adverse action, first provided "no reason at all" for the adverse action and "did not document the details of the incident or conduct even the most basic factfinding"). Therefore, "[i]f a plaintiff can demonstrate that the legitimate reasons offered by the defendant were not its

non-discriminatory reason for placing her on unpaid administrative leave. On the other hand, Racklin's complaints to Zeta's HR department in early December 2020 are too remote in time to establish any causation with respect to her being place on ULOA on July 29, 2021. [SUF], ¶ 68; [Stoler Decl.], Ex. 50.

true reasons, but were a pretext for discrimination or retaliation, summary judgment is not appropriate." *Id.* (cleaned up).

In her October 20, 2021 letter to Zeta's counsel, Racklin's counsel inquired as to the status of Zeta's investigation, the status of Racklin's employment with Zeta, and Zeta's basis for withholding Racklin's commissions. [Doc. No. 149-33], Ex. 33. In his November 3, 2021 response, Zeta's counsel explained that their review of Fong's investigation materials and Racklin's discovery responses presented no reason to deviate from Fong's initial July 23, 2021 findings and that Racklin was on unpaid administrative leave because "(i) she refuses to report to work and has not been approved for additional paid time off in accordance with the Company's policies; and (ii) . . . Racklin refuses to have any direct communication with her supervisors and thus could not perform her job duties even if she did report to work." [Doc. No. 149-34], Ex. 34.

Racklin argues that Zeta's justifications are pretextual because they were formulated after Racklin engaged in protected activity. Specifically, Racklin points to the fact that Zeta, through counsel, did not inform Racklin until November 3, 2021 why it placed her on unpaid administrative leave. But the evidence here fails to establish as a matter of law that Zeta's stated reasons for placing Racklin on unpaid administrative leave were pretextual. Racklin had in fact violated the company's PTO policy as of July 29, 2021 and, as a result, her placement on ULOA was entirely consistent with and permissible under that policy. Racklin had also made clear that she did not intend to return to Zeta's employment, stating in her July 9, 2021 demand letter that "continued employment with Zeta under the current circumstances is untenable" and that it "will take years for [her] to recover from what she has endured at Zeta, *find a new position, and rebuild her business reputation at another company*, and any resolution of this matter must reflect this reality." [Stoler Decl.], Ex. 70 (emphasis added). When her counsel followed up again on July 28, Racklin

again sought a "mutually agreeable exit from Zeta." [Doc. No. 149-38], Ex. 38 at 7. From Zeta's perspective then, Racklin had no intention of ever returning to Zeta as an employee.[27]

Racklin contends that pretext can be inferred from the inconsistencies in Zeta's explanations in its July 29, 2021 and November 3, 2021 letters and also the "sham" investigation it conducted after July 29. None of these contentions sufficiently evidences pretext. The July 29 letter referenced her PTO beyond two weeks,[28] as did the November 3rd letter, and while the November 3 letter gave a more fulsome explanation, all of the listed reasons had already been given (i.e., her taking extended PTO leave) or were based on her own stated refusal to return to work, as stated in her July 9th letter. Zeta's failure to specifically reference the PTO policy in its July 29th letter or its statement that it was placing Racklin on leave while it interviewed witnesses does not create, as a matter of law, the kind inconsistency in position from which pretext can be inferred. *See Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006) (holding that a plaintiff will not survive summary judgment by "focusing on minor discrepancies that do not cast doubt on the explanation's validity").

The record also does not reflect a "sham" investigation. After first learning of Racklin's allegations in her July 9, 2021 demand letter, Zeta retained counsel that same day to conduct an

---

[27] After her July 30th letter, Racklin did not follow up again on the status of her employment until October 20th. And in his November 3rd letter, Stoler explicitly stated that "[i]n the event that Ms. Racklin continues to refuse to report to work or communicate with her supervisors, she will remain on unpaid administrative leave." [Doc. No. 149-34], Ex. 34 at 2. Though Racklin always had the option of returning to Zeta, she offers no evidence of actually trying to return to Zeta's employment or working out an alternative. Nor has she shown that any such efforts would have been futile. For example, Martella and Racklin did discuss a potential internal transfer in January 2021, which indicates that Zeta would have potentially entertained a different working situation had Racklin sought to return to Zeta. *See* [Stoler Decl.], Ex. 63; [SUF], ¶ 84; [RSUF], ¶ 84.

[28] Racklin relies heavily on the statement in Zeta's July 29th letter that "[g]iven Ms. Racklin has been on PTO since July 9, 2021 and further investigation is still warranted, Zeta is placing Ms. Racklin on an unpaid administrative leave of absence effective July 29, 2021, while we interview the witnesses now identified by Ms. Racklin regarding her claims." [Doc. No. 149-35], Ex. 35. Racklin reads this statement as in essence saying that Zeta is placing her on unpaid leave *because* she has made a claim. When viewed within the context in which it was written and the applicable employment policies, that letter cannot reasonably be understood as stating that she was being placed on ULOA in retaliation for alleging wrongdoing on the part of Zeta.

initial investigation into Racklin's claims. Zeta's counsel reported its findings to Racklin's counsel on July 23, 2021, noting that it could not substantiate Racklin's claims. [Fong Decl.], Ex. 2. Counsel for Zeta conducted an additional investigation upon receiving Racklin's documentary evidence, finding no basis to deviate from its original determination. In short, Zeta quickly hired counsel upon receiving the July 9th demand letter, who promptly investigated and reported its findings to Racklin and then conducted a subsequent investigation after receiving additional information from her on July 28, including an interview with Racklin on August 13. Racklin complains that she did not hear further from Zeta about the investigation until Zeta's November 3, 2021 letter and only after she, through counsel, inquired on October 20, 2021. That contention, however, must be considered in light of how the legal landscape had fundamentally changed once Racklin filed suit in this Court on August 13, 2021,[29] and submitted an on-line request to initiate a charge of discrimination against Zeta with the Equal Opportunities Commission on August 17, 2021. [Am. Compl.], ¶¶ 137-40. Once Racklin initiated those various proceedings, the parties were no longer communicating through informal pre-suit negotiations. As explained in Fong's declaration, once Racklin commenced suit in this Court, the posture between the parties changed as a separate litigation team took over the case from Fong. [Fong Decl.], ¶¶ 19-20. Therefore, no reasonable inference of discriminatory or retaliatory animus can be drawn from Zeta's silence on the results of counsel's investigation.

For the above reasons, Racklin has failed to present a genuine dispute of material facts such that a reasonable factfinder could find that Racklin "would not have been" placed on unpaid leave

---

[29] Zeta filed its Answer to the Complaint on September 17, 2021 [Doc. No. 6]; a Scheduling Order was issued on September 20, 2021, with an initial pretrial conference set for October 13, 2021, a final pretrial conference on February 17, 2022 and a discovery cutoff date of February 11, 2012 [Doc. No. 11]; on September 28, 2021, the Court approved a Joint Discovery Plan [Doc. No. 13] and on October 20, 2021 the parties entered into and the Court approved a Stipulated Confidentiality Agreement and Protective Order [Doc. Nos. 15, 16]. At Racklin's request, the EEOC issued a Right to Sue Letter on January 19, 2021, *see* [Doc. No. 71-9]; and on February 4, 2021, Racklin, with leave of Court, filed her Amended Complaint, adding her Title VII claims.

"but for [Zeta's] retaliatory animus." *Foster*, 787 F.3d at 252. For the above reasons, summary judgment will be granted as to Count IX's retaliation claim.

### ii.     *Constructive Discharge*

Racklin has alleged that she was constructively discharged and that disputed issues of material fact exist as to that claim, primarily because Zeta placed her on an ULOA, never invited her to return to work, and did not fully investigate her claims. [Doc. No. 149], at 30. Those reasons fail as a matter of law to establish her constructive discharge claim.

In order to prevail on her constructive discharge claim, Racklin must ultimately prove: "[1] the deliberateness of the employer's actions, motivated by unlawful bias; and (2) the objective intolerability of the employment conditions." *McKinley v. Salvation Army*, 192 F. Supp. 3d 678, 684 (W.D. Va. 2016) (citing *Freeman v. Dal–Tile Corp.*, 750 F.3d 413, 425 (4th Cir. 2014)). "Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the plaintiff to quit." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 237 (4th Cir. 1999) (en banc). Intolerability requires more than "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006) (citation omitted).

For the reasons previously stated with respect to Racklin's discrimination, hostile work environment, and retaliation claims, Racklin fails as a matter of law to present a material genuine dispute regarding whether Zeta acted with an unlawful bias. Nor does the record reflect that Zeta placed Racklin on unpaid leave in an effort to force her to quit or that its decision subjected Racklin to intolerable working conditions. In her July 9, 2021 demand letter, Racklin made clear that she viewed "continued employment with Zeta" as "untenable." [Stoler Decl.], Ex. 70 at 4. From Zeta's perspective, Racklin had no intention of ever returning to Zeta; and Racklin, through her counsel's

correspondence with Zeta, never indicated that she was waiting on or expecting an invitation to return. Zeta's counsel's letter on November 3rd clearly explained that Racklin would "remain on unpaid administrative leave" to the extent that she "continues to refuse to report to work or communicate with her supervisors." [Stoler Decl.], Ex. 71 at 1-2 ("Ms. Racklin remains on unpaid leave of absence with Zeta due to circumstances purely of her own making."). Racklin, therefore, could have begun receiving her salary again by agreeing to return to work; however, she made no attempted return. Additionally, from Zeta's November 3, 2021 letter, it clearly believed Racklin was "refus[ing] to report to work," [Stoler Decl.], Ex. 71 at 1; but Racklin never corrected Zeta's belief, only responding to this letter on January 20, 2022, the day before she officially resigned from Zeta, [Doc. No. 152-8], Ex. 8.[30]

With respect to the investigation, Racklin only offers a generalized criticism; but as described in the letters from Zeta's counsel, Zeta conducted both a "preliminary investigation" and a "subsequent investigation" of Racklin's claims. [Fong Decl.], Ex. 2 at 1; [Stoler Decl.], Ex. 71 at 1. Stoler's November 3rd letter does not indicate that counsel's investigation ceased in July, as the letter specifically notes that counsel reviewed Fong's investigation materials as well as discovery responses from Racklin in determining that there was no basis to deviate from Fong's

---

[30] Although not raised in her briefing, Racklin argued at the July 27th hearing that her constructive discharge was also reflected in Zeta's decision to "cut off her electronic access" to Zeta's system after placing her on unpaid leave, thereby preventing her returning to work. The Court finds that contention without merit. As repeatedly discussed, Racklin's various letters reflect that she had no intention of returning to Zeta's employment following the submission of her demand letter, discussing only how her relationship with "Zeta" had become "untenable" and did not propose alternative working arrangements. At most, Racklin's letters suggest that she might have returned to work only if Martella and McCarthy no longer served as her supervisors. But Zeta was under no obligation to honor such a request, if in fact made, given the findings of their investigations. *See Rhodes v. Johnson*, 2014 WL 2531594, at *8 (W.D.N.C. June 5, 2014) ("Where, as here, the employer conducts a reasonable investigation of the complaint and cannot corroborate the allegations of the complainant, it is under no obligation to fire the alleged harasser simply because the complainant wants that person out of the workplace."). Given the circumstances, Zeta's decision to cut off Plaintiff's electronic access was in response to Plaintiff's unilateral, unauthorized, and indefinite leave as well as unambiguous statements that she would seek work elsewhere. Therefore, it does not support the inference that Zeta tried to force Plaintiff to quit, but merely suggests a company did not wish for an antagonistic employee potentially seeking work elsewhere to continue to have access to its system. All the evidence suggests that Zeta would have restored Plaintiff's access if she actively sought to return to work.

initial findings. [Stoler Decl.], Ex. 71 at 1. Moreover, Fong conducted an additional investigation in early August 2021, interviewing a total of 11 witness, including Martella and McCarthy. [Fong Decl.], ¶¶ 17-18. The summary judgment record, therefore, does not support Racklin's claim that Zeta's investigation contributed to her purported constructive discharge. *Cf. Lee v. Cleveland Clinic Found.*, 676 App'x 488, 496 (6th Cir. 2017) (determining "a genuine issue of material fact remains" as to whether company's "general[] fail[ure] to investigate Plaintiff's complaints . . . . contributed to a constructive discharge").

In sum, because Zeta (1) never prevented Racklin from returning to work and (2) promptly investigated Racklin's complaints, Racklin fails as a matter of law to offer evidence that would allow a factfinder to find that she was constructively discharged. *See Rhodes*, 2014 WL 2531594, at *8 (granting summary judgment on plaintiff's constructive discharge claim where plaintiff "resigned from her employment when her complaints were uncorroborated by [the company's] investigation and [the company] refused to fire [her supervisor] nonetheless").

## IV.    CONCLUSION

For the foregoing reasons, there are no genuine issues of material fact as to any of Plaintiff's claims and Defendant is entitled to judgment as a matter of law on all of Plaintiff's claims. Accordingly, it is hereby

**ORDERED** that Defendant Zeta Global Corp.'s Motion for Summary Judgment [Doc. No. 135] be, and the same hereby is, **GRANTED** as to all Counts and this action is **DISMISSED**; and it is further

**ORDERED** that Defendant's Motion *in Limine* to Exclude the Expert Report and Testimony of Michael J. Kresslein [Doc. No. 143] be, and the same hereby is, **DENIED** as moot; and it is further

**ORDERED** that Plaintiff's Motion to Strike Reply Declaration of Jonathan Stoler, Esq. [Doc. No. 155] be, and the same hereby is **DENIED**.

The Clerk is directed to forward copies of this Order to all counsel of record and enter judgment in Defendant's favor pursuant to Fed. R. Civ. P. 58.

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
September 14, 2022

47