**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-2077

MELISSA RACKLIN,

        Plaintiff – Appellant,

v.

ZETA GLOBAL CORP.,

        Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony J. Trenga, Senior District Judge. **(**1:21−cv−01035−AJT−JFA)

Submitted: April 26, 2023                                         Decided: August 11, 2023

Before RICHARDSON and QUATTLEBAUM, Circuit Judges, and MOTZ, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ON BRIEF:** Carla D. Brown, Peter C. Cohen, CHARLSON BREDEHOFT COHEN BROWN & NADELHAFT, P.C., Reston, Virginia, for Appellant. Jonathan Stoler, Eric Raphan, Lindsay C. Stone, New York, New York, Paul Werner, Imad S. Matini, SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Melissa Racklin appeals the district court's order granting summary judgment in favor of Zeta Global Corporation on her claims for fraud in the inducement, breach of contract and violations of Title VII. We agree with the district court that Racklin failed to present evidence creating a genuine dispute about any material fact relating to these claims. So we affirm.

I.

Zeta is a digital marketing and technology company. J.A. 128. Zeta hired Racklin's former boss, Donald Steele, in March 2017 to serve as its Chief Revenue Officer. J.A. 128. Not long afterward, Zeta began recruiting Racklin. J.A. 129-130.

Racklin interviewed for a sales position with Zeta in October 2018. J.A. 129. During the interview, Racklin met with Steele and Steven Gerber, Zeta's Chief Operating Officer. *Id.* According to Racklin, Gerber and Steele promised Racklin that she would be assigned and or would lead the T-Mobile, Sprint and Verizon client accounts if she joined Zeta. But Racklin also learned that Verizon Wireless ("VW"), which is Sprint and Verizon's mobile phone division, were already assigned to Chad Miller, Zeta's Senior Vice President of Brand Development.

A few days after her interview, Zeta sent Racklin an offer letter for the position of Vice President for Enterprise Sales. J.A. 130. In that role, she would be responsible for selling Zeta's proprietary "ZX" product, "which provides digital media solutions to assist companies in acquiring new customers." J.A. 128. The offer letter did not identify specific

2

clients or accounts that Racklin would lead or work on. *Id.* It did not mention the assignment of any particular accounts to her. *Id.* But it did provide that by signing the offer letter, Racklin agreed to "comply with and be bound by the operating policies, procedures and practices of the Company." J.A. 49. The offer letter also stated that it "sets forth the entire agreement and understanding between the Company and you relating to your offer of employment and supersedes all prior verbal discussions between us." J.A. 51. Racklin admits she reviewed the offer letter and understood its terms before signing it. J.A. 131.

During Racklin's employment at Zeta, she was paid a base salary and could earn commissions on any deal with any client she brought to Zeta. J.A. 131. Racklin, like other Zeta sales employees, received a new commission plan every calendar year. J.A. 131. Racklin signed her first commission plan in March 2019. J.A. 131. This 2019 Plan provided Racklin would be eligible to receive commissions in the amount of 5% of gross recognized revenue on ZX deals she brought to Zeta. J.A. 131-132. And it gave Zeta the right to modify and interpret the Plan's terms. J.A. 132.

Around that same time, Racklin told Gerber, Steele and Sean Welsh—her direct manager at the time—about an opportunity with Verizon Fios ("VF"),[1] which she claimed was distinct from the work Miller was doing for VW through his Verizon contact. Gerber authorized Racklin to pursue a "pilot" contract with VF. J.A. 132. But within a few months, Verizon restructured and collapsed VF into its existing VW business unit and assigned Miller's contact at VW to manage Verizon's overall Zeta relationship. J.A. 133. Verizon

---

[1] VF is Verizon's cable and internet division. J.A. 132 n.2.

3

then told Zeta that it wished to negotiate and deal with only one Zeta team going forward. J.A. 133. Given those developments, Gerber assigned Miller exclusive responsibility for the VW account. J.A. 133. Verizon also decided not to move forward with the VF pilot that Racklin had been pursuing, after which Racklin had no further contact with Verizon. J.A. 133.

Gerber offered to amend Racklin's 2019 Plan to make her eligible for commissions amounting to 3% of gross recognized revenue over the "run rate" on ZX deals that any Zeta sales representative closed with Verizon "for a period of up to three years." J.A. 133-34.[2] Although it provided her with the ability to earn commissions she would not otherwise have had and although she signed the 2019 Amendment, Racklin disputes its validity. She argues that she "repeatedly and adamantly objected to Zeta's decision to remove her from the Verizon account and reduce her Verizon commission to 3%," and only "signed the 2019 Amendment . . . under duress." J.A. 1940–941.

In March 2020, Gerber removed Steele as Zeta's Chief Revenue Officer, dissolved the sales team that Racklin was assigned to and terminated every team member except Racklin and a few others. J.A. 134. According to Gerber, he did not terminate Racklin then because he still believed in Racklin's ability to generate revenue. J.A. 135. Gerber assigned Racklin to a new ZX sales team reporting to Matt Martella, who Zeta had recently hired as President of ZX. J.A. 134.

---

[2] The nuances of "gross recognized revenue" and "run rate" are not material to our resolution of Racklin's appeal.

4

In April 2020, Zeta presented Racklin with a copy of her proposed 2020 commission plan. J.A. 135. The proposed plan changed the terms for her Verizon commissions. Instead of commissions of 3% of gross recognized revenue over the run rate on ZX deals that any Zeta sales representative closed with Verizon over three years, the proposed plan made Racklin eligible for commissions on all Verizon business at a rate of 1% of sales from Verizon for 2020. J.A. 135. According to Zeta, it did this because the final terms of the VW deal were materially different from what had been originally anticipated, rendering the run rate difficult to apply. Racklin initially refused to sign the Proposed Plan. J.A. 135. Over the following two weeks, however, Racklin and Zeta negotiated revised terms. They eventually agreed that (i) Racklin would be eligible to earn 1.5% of gross revenue from Verizon for three years and (ii) Racklin's commissions on Verizon deals would be calculated based upon billed revenue rather than revenue actually collected. J.A. 135. Although Racklin concedes she read this 2020 Plan before she signed it and understood its terms, Racklin now claims she signed it under duress as well. J.A. 1941-1942.

Ultimately, the Version deal closed in 2020. Miller, not Racklin, closed the deal and Racklin did not bring it to Zeta.

In the summer of 2020, Martella began to develop serious concerns regarding Racklin's performance. J.A. 136. Martella expected all ZX salespersons to close 4 to 6 deals per year, but Racklin, as of August 2020, had only closed one. J.A. 136. Between August and December 2020, Martella considered placing Racklin on a performance improvement plan ("PIP") and possibly terminating her employment if her sales numbers

5

did not improve. J.A. 136. But he decided not to take any action at that time, instead giving Racklin additional time to improve her performance. J.A. 136.

By late 2020, Racklin lodged complaints about her supervisors at Zeta. J.A. 137. In December 2020, Racklin forwarded to Denise Lang, Zeta's acting head of Human Resources, an email she had sent to Martella and Gerber complaining about their criticisms of her work. J.A. 137. During a follow-up call with Lang, Racklin also complained that she was the only member of her team not selected to present during a July 2020 account review. J.A. 137. Lang subsequently gathered information about the account review presentation process and shared that information with Racklin. J.A. 137. Despite that, Racklin later instructed Lang to stop any additional inquiries. J.A. 137.

In March 2021, Racklin agreed to the terms of her 2021 Plan, which contained the same terms about her Verizon commissions as her 2020 Plan. Like the 2020 Plan, J.A. 61, the 2021 Plan also provided that in order to receive commissions, Racklin must "[1] be employed and [2] in good standing on the date that the [commissions] are paid by Zeta Global." J.A. 68. Under Zeta's definition of "good standing," Racklin was required to "not [be] subject to any disciplinary proceedings, [not have] received any disciplinary sanctions and/or [not be] subject to performance management." J.A. 68. Although she signed it, Racklin says she objected "because it did not align with prior agreements." J.A. 1943.

6

According to Zeta, Racklin's performance did not improve.[3] Soon after the execution of her 2021 Plan, Racklin and Martella had a phone call. Although the parties dispute "whether Martella discussed performance-related issues with Racklin, there is no dispute that Martella asked Racklin to at least consider explor[ing] another role internally." J.A. 2921.

In April 2021, Martella finalized a PIP for Racklin, J.A. 139, but he did not deliver it to Racklin at that time because as part of a recent merger, Zeta had hired a new head of business development to whom Racklin would report. Even so, a few months later, in July 2021, Martella decided to place Racklin on a PIP. He attempted to set up a meeting with Racklin on July 7, 2021, to communicate that decision. J.A. 139. Racklin, however, told Martella on July 6 that she could not attend a meeting on July 7 because of her daughter's surgery. "Martella agreed to reschedule the meeting for some time early next week." J.A. 2921.

On July 9, 2021, Racklin's counsel sent a demand letter to Zeta. Among other things, the demand letter set forth Racklin's potential claims against Zeta, informed Zeta that Racklin was willing to enter into a separation agreement in exchange for a settlement of $2.85 million and requested that "Mr. Martella and Mr. McCarthy have no direct communication with Racklin." J.A. 1819–822. In addition, the demand letter explained that, due to her treatment while working for Zeta, Racklin could "no longer continue her

---

[3] During her employment at Zeta, Racklin closed deals with only two clients—Charter and Cox Communications. J.A. 139.

7

employment without risking further harm," J.A. 1821, and that "[her] continued employment with Zeta under the circumstances is untenable." J.A. 1822. Then, on July 12, 2021, Racklin, in violation of Zeta's policies, began taking paid time off ("PTO"), without Zeta's approval and without informing Zeta when she planned to return. J.A. 140.

On July 29, 2021, Zeta's counsel notified Racklin's counsel that: "Given [that] Ms. Racklin has been on PTO since July 9, 2021 and further investigation is still warranted, Zeta is placing Ms. Racklin on an unpaid administrative leave of absence effective July 29, 2021, while we interview the witnesses now identified by Ms. Racklin regarding her claims. We will contact you separately to arrange for an interview of Ms. Racklin at the appropriate time." J.A. 2575.

On August 13, 2021, Zeta's counsel interviewed Racklin as part of its investigation into her claims. J.A. 2923. That same day, Racklin sued Zeta. J.A. 2923. A few months later, Racklin resigned from Zeta to start a new job. J.A. 35. She then amended her complaint raising the following claims: (1) fraud in the inducement relating to her recruitment and initial employment contract; (2) breach of contract relating to the Verizon commission plans; (3) unjust enrichment; (4) breach of contract relating to the June 2021 Plan and "later commissions"; (5) breach of contract relating to her PTO; (6) violation of the Wage Payment Act, Va. Code Ann. § 40.1-29; (7) discrimination and hostile work environment in violation of Title VII; and (8) retaliation and constructive discharge in violation of Title VII. J.A. 18.

After discovery, Zeta moved for summary judgment. J.A. 121. In a thorough opinion, the district court granted Zeta's motion on all counts. J.A. 2913. Racklin appealed

but only challenges the district court's dismissal of her fraud in the inducement claim, breach of contract claim relating to the Verizon commissions due under the 2019 Amendment, breach of contract relating to the 2021 Plan and her Title VII claims. Op. Br. 1–3.

II.

We review summary judgments de novo, applying the same legal standards as the district court and viewing all facts in the light most favorable to the nonmoving party. *W.C. Eng., Inc. v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398, 402–03 (4th Cir. 2019). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

III.

A. Fraud in the Inducement

Racklin first argues that the district court erred in determining that her fraud in the inducement claim was barred by the two-year statute of limitations. Op. Br. 39. The statute of limitations for fraud actions in Virginia is "two years after the cause of action accrues." Va. Code Ann. § 8.01-243(A). The cause of action does not accrue until such fraud is discovered "or by the exercise of due diligence reasonably should have been discovered." Va. Code Ann. § 8.01-249(1). And the burden rests with the plaintiff to "prove that, despite the exercise of due diligence, [she] could not have discovered the alleged fraud within the

9

two-year period before [she] commenced the action." *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 839 (Va. 2008).

The district court found that the statute of limitations period began to run in July 2019.

> [B]y July 2019, at the absolute latest, Racklin knew, or should have known, that she would not receive the T-Mobile, Sprint, and Verizon accounts as Zeta purportedly promised during the recruitment process. She did not receive those accounts upon joining Zeta in late-2018, and, after months of asking to work on those accounts, Zeta continued to refuse to reassign the accounts from Miller to Racklin, even assigning away the Verizon account despite her "repeatedly and adamantly object[ing] to Zeta's decision to remove [her] from the Verizon account."

J.A. 2928. And since Racklin did not initiate this lawsuit until August 13, 2021, the district court held that the statute of limitations barred this cause of action because by July 2019, "a reasonable and prudent person should have realized that Zeta would not be reassigning those accounts from Miller to Racklin[.]" J.A. 2928.

Racklin does not meaningfully challenge these findings. But she contends Zeta's continued false assurances after August 13, 2019, induced her to stay with Zeta and not take legal action, and render her claim timely and ripe for a jury's consideration. She first points to a text message conversation between her supervisors, Martella and Gerber. In that message, Martella informs Gerber that there is "a lot of thrash just now as Melissa Racklin has an ORP[4] for Sprint tomorrow. I don't have all the facts[,] but it seems to me that outside

---

[4] OPS is short under Zeta's procedures for Opportunity Review Process. J.A. 185.

10

of Shelby and the CRM[5] opp, Sprint is owned by Chad and Shannon." J.A. 2324. This text message exchange does not create a genuine dispute of material fact because there is no evidence that Racklin was even aware that this conversation occurred. And even if she were, this statement does not include any false assurances or inducements to Racklin. To the contrary, it says that Miller, not Racklin, was going to handle the Sprint account.

Racklin also asserts that her deposition testimony establishes that Zeta continued to make false assurances to her. Specifically, she testified that Welsh—her supervisor—repeatedly told her throughout January 2019 that the T-Mobile account belonged to Chad Miller but that could "potentially" change depending on the terms of the merger. J.A. 249-50. But this testimony refers to conversations in January 2019, which took place before, not after, the district court held the statute began to run. As a result, these conversations do not create a genuine dispute of material fact.

The district court correctly found that this claim was barred by the applicable statute of limitations.

### B. Breach of Contract (2019 Amendment Agreement)

Racklin next argues that the district court erred in granting summary judgment to Zeta on her breach of contract claim relating to the 2019 Amendment Agreement. She contends that she should have been paid commissions for the Verizon deal under the 2019 Amendment Agreement rather than the 2020 Plan. According to Racklin, the 2020 Plan was an improper modification of the 2019 Amendment Agreement. But that is inconsistent

---

[5] CRM is short under Zeta's procedures for Customer Relationship Management.

11

with the plain terms of the document. The 2019 Amendment Agreement applied to business executed in the 2019 calendar year.[6] J.A. 53 ("The following are the financial terms of your individualized Incentive Plan for the period of January 1, 2019 – December 31, 2019[.]"); J.A. 987 ("[T]his is a 2019 plan that covers business that's executed in that calendar year."). The 2020 Plan applied to the 2020 calendar year. J.A. 61 ("The Plan is effective from January 1, 2020 through December 21, 2020."). And the Verizon deal, the transaction for which Racklin seeks compensation in her breach of contract claim, took place in 2020. Racklin's statements that are directly contradicted by the plain language of the parties' agreement do not create a genuine dispute of material fact. Accordingly, the district court did not err in granting summary judgment to Zeta on her breach of contract claim relating to the 2019 Amendment Agreement.[7]

---

[6] Further, the express terms of the 2019 Plan gave Zeta the exclusive right "to amend, modify, waive provisions of, and/or terminate the Plan at its absolute sole discretion." J.A. 58.

[7] Below, Racklin argued that she signed the 2019 Amendment Agreement and the 2020 Agreement under duress. J.A. 2930. But the word duress appears only one time in her opening brief and is used only in relation to the execution of the 2020 Plan. Op. Br. 18 ("I ultimately signed the 2020 plan under duress after Mr. Martella told me that I would not receive my salary or commissions if I did not sign."). While Racklin states that "a jury more accurately could find she was forced to accept the reduction or receive no Verizon commissions at all," she makes no attempt to set forth the relevant standard for duress or include any legal discussion of duress under Virginia law. Op. Br. 41. Accordingly, we conclude that this issue has been waived. J.A. 2930–933. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop [its] argument—even if [its] brief takes a passing shot at the issue." (internal quotation marks omitted)). But even if not waived, Racklin failed to present evidence that would create a genuine dispute of material fact as to duress. Under Virginia law, "[d]uress is not readily accepted as an excuse, and must be proven by clear and convincing evidence." *Pelfrey v. Pelfrey*, 487 S.E.2d 281, 284 (1997)

C. Breach of Contract (June 2021 commissions)

Next, Racklin argues that the district court erred in granting summary judgment to Zeta on her breach of contract claim based on the 2021 Plan by withholding June 2021 commission payments.[8] In granting summary judgment to Zeta on this claim, the district court relied on the terms of the 2021 Plan, which provide that no incentive payouts would be made unless the Plan participant was actively employed and in good standing with Zeta through the date of payment. J.A. 70. And the district court noted that good standing means "that the Plan Participant is not subject to any disciplinary proceedings, ha[s] not received any disciplinary sanctions and/or [is] not subject to performance management." J.A. 68.

Last, it pointed to the 2021 Plan's provision that "[i]n the event of uncertainty regarding, or a dispute pertaining to, the meaning, interpretation and/or application of any provision of the Plan, Zeta Global's decision will be final and binding." J.A. 71. The district court then held that Zeta was entitled to summary judgment on the remaining breach of contract claims because Racklin failed to demonstrate that she was in good standing as

---

(internal quotation marks omitted). "Duress exists when a defendant commits a wrongful act sufficient to prevent a plaintiff from exercising his free will, thereby coercing the plaintiff's consent." *Goode v. Burke Town Plaza, Inc.*, 436 S.E.2d 450, 452 (1993). "Because the application of economic pressure by threatening to enforce a legal right is not a wrongful act, it cannot constitute duress." *Id.* at 452–53; *see also Seward v. Am. Hardware Co.*, 171 S.E. 650, 662 (1933) ("A contract reluctantly entered into by one badly in need of money without force or intimidation and with full knowledge of the fact is not a contract executed under duress."). Given these requirements, Racklin's evidence does not create a genuine issue of fact.

[8] Racklin argued below that Zeta also breached the 2021 Plan by failing to continue paying her salary. J.A. 41. But by failing to raise the issue in her opening brief, Racklin has waived that argument. *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999).

13

required under the terms of her employment contract prior to the July 31, 2021, the due date for the June commissions. It based that decision on undisputed evidence in the record that Zeta decided to place Racklin on a PIP and tried to meet with her to present the PIP in early July 2021. It then noted that Racklin "refused to have any further direct communications with her supervisors, declared that her continued employment was 'no longer tenable' and demanded a $2.85 million settlement of her claims against [Zeta]." J.A. 2938. The court added that "[a]t a minimum, given the decision to place her on a PIP, Racklin was subject to 'performance management' as of the time her June 2021 commission payments were due[9], and her violation of the PTO policy subjected her to disciplinary action." J.A. 2938.

On appeal, Racklin insists there is a genuine dispute of material facts as to whether she was in good standing or subject to performance management. In advancing this argument, she relies on the fact that she had not formally received notice of any disciplinary action. But accepting this evidence as true, it does not create a genuine dispute of material fact. The clear terms of the 2021 Plan gave Zeta the sole authority to determine whether an employee was in good standing or subject to performance management. J.A. 2937. Thus, Racklin's claim for contractual breach of the 2021 Plan fails as a matter of law.

---

[9] It is undisputed that the payout date for Racklin's June 2021 commissions was July 30, 2021. J.A. 32, Resp. Br. 35.

D. Title VII Hostile Work Environment

Racklin contends that the district court erred in concluding that her hostile work environment claim failed as a matter of law. In granting summary judgment, the district court explained that a plaintiff must show that the alleged conduct was "(1) was unwelcome; (2) resulted because of her gender, disability, or prior protected activity; (3) was sufficiently severe or pervasive to alter the conditions of her employment; and (4) was imputable to her employer." J.A. 2944 (quoting *Pueschel v. Peters*, 577 F.3d 558, 564-65 (4th Cir. 2009) (internal quotation marks omitted)). In addition, the district court recognized that the second element requires a plaintiff to show that "but for the employee's gender, [she] would not have been the victim of the discrimination." J.A. 2944 (quoting *Nathan v. Takeda Pharm. Am., Inc.*, 890 F. Supp. 2d 629, 641 (E.D. Va. 2012)).

It then held that the evidence presented by Racklin did not meet this standard. The court reviewed Racklin's claim that she was spoken to "in a critical and condescending tone." J.A. 2946. Yet the evidence demonstrated that Martella's "management style [was] abrasive, blunt, and rude towards everyone on the team" and that he was "very difficult [for everyone] to work with." J.A. 2947. As a result, the district court concluded that, viewed in the light most favorable to Racklin, this evidence failed to show that this treatment was based on her gender, disability or other protected activity. The district court also held that Martella's alleged conduct was not sufficiently severe or pervasive to create a hostile work environment. J.A. 2949 (citing *Holleman v. Colonial Heights Sch. Bd.*, 854 F. Supp. 2d 344, 352-53 (E.D. Va. 2012) (granting summary judgment in favor of defendant on severe or pervasive prong despite plaintiffs' allegations that supervisor

15

"treat[ed] female employees with disrespect and disdain by cursing, yelling, berating, and reprimanding, and even suggesting resignation" as those complaints "seem to reflect [plaintiffs'] misgivings with the 'callous behavior [of their] superior[]'" and were more akin to a "personality conflict.")).

On appeal, Racklin insists that the evidence she presented created a genuine dispute over material facts. But we disagree. We see no error in the district court's application of the evidence presented to the high burden required for hostile work environment claims.

### E. Title VII Retaliation

Finally, Racklin challenges the district court's decision to grant Zeta summary judgment on her Title VII retaliation claim concerning commissions Zeta withheld. She argues that Zeta retaliated against her for sending the July 9, 2021, demand letter—which she argues is protected activity—by refusing to pay her June 2021 commissions and by later placing her on unpaid administrative leave.

In rejecting these arguments, the district court held that by the date of the demand letter, there was no dispute in the record that Racklin had performance-related issues. J.A. 2950. It pointed out that as early as August 2020, Zeta discussed putting her on a PIP; by April 2021, Zeta had finalized a PIP for her; and Zeta intended to present her with a PIP two days before her demand letter. J.A. 2950. Since the actions that rendered Racklin ineligible for the commissions began before her alleged protected activity, the district court held that Racklin failed to show a prima facie case of retaliation. J.A. 2951.

We see no error in the district court's order on this issue. It accurately described Fourth Circuit law and properly applied the evidence from the record. Even viewing the

16

evidence in the light most favorable to Racklin, she failed to establish a genuine dispute of materrial fact.[10]

IV.

For these reasons, we affirm the district court's order granting summary judgment in favor of Zeta. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED*

---

[10] Racklin also argues that a genuine dispute of material fact exists as to whether Martella subjected her to a retaliatory hostile work environment following her December 2020 complaint to Zeta's human resources department. However, Racklin failed to address this claim in her response in opposition to summary judgment. Accordingly, Racklin has abandoned it. *See Imperial v. Suburban Hosp. Ass'n, Inc.*, 37 F.3d 1026, 1031 (4th Cir. 1994) (holding that claim pled in complaint but not incorporated in summary judgment motion could not be considered on appeal).

17